**GOODSON–TODMAN ENTERPRISES, LTD., Petitioner-Appellee,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

**No. 182, Docket 85–4083.**

United States Court of Appeals, Second Circuit.

Argued Oct. 9, 1985.

Decided Jan. 29, 1986.

---

Elaine F. Ferris, Tax Div., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Richard Farber, Tax Div., Dept. of Justice, Washington, D.C., of counsel), for appellant.

Lyman G. Friedman, Washington, D.C. (Robert A. Schulman, Williams & Connolly, Washington, D.C., of counsel), for appellee.

Norman L. Schwartz, Sheldon S. Cohen, Roger A. Pies, Howard J. Hoffman, Morgan, Lewis & Bockius, Washington, D.C., for amici curiae Jack Barry Productions, Inc. and Enright Enterprises, Inc.

Before FEINBERG, Chief Judge, and VAN GRAAFEILAND and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a decision of the United States Tax Court, Sterrett, *J.,* that appellee Goodson-Todman is entitled to receive the Investment Tax Credit (ITC) with respect to the production costs of its tapes of the television program "To Tell The Truth" (TTTT). *Goodson-Todman Enterprises v. Commissioner,* 84 T.C. 255 (1985). We affirm, but on grounds different from those relied on by the tax court.

At issue in this case is the application of section 48(k)(1)(B) of the Internal Revenue Code, 26 U.S.C. § 48(k)(1)(B) (1982), and Treasury Regulation 1.48–8(a)(3)(iii), Treas. Reg. § 1.48–8(a)(3)(iii) (1979), promulgated thereunder, to television game shows as a class and to a particular game show. We begin our analysis with the statute.

*The Statute*

The Tax Reform Act of 1976, Pub.L. No. 94–455, 1976 U.S.Code Cong. & Ad.News (90 Stat.) 1520, 1591–96, amended section 48 of the Internal Revenue Code by creating a new subsection (k) which comprises special rules for the application of the ITC to motion picture and television films. Prior to the amendment, it had been established that motion pictures and television films were tangible personal property eligible for the ITC, *Walt Disney Productions v. United States,* 327 F.Supp. 189 (C.D.Cal.

1971), *aff'd and modified,* 480 F.2d 66 (9th Cir.1973), *cert. denied,* 415 U.S. 934, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974). However, the question of how to determine the useful life of such films was unsettled. Useful life was important, because under then existing law no ITC was available with respect to property with a useful life of less than three years; one-third credit was available for property of at least three years useful life; the credit increased to two-thirds with a useful life of at least five years; and a full credit was available only for property whose useful life was seven years or more. The 1976 amendment was designed, *inter alia,* to eliminate the useful life question:

Due to the uncertainties of present law with respect to the questions of useful life and predominant foreign use, it is often difficult to determine whether a film is entitled to a full credit, a partial one-third or two-thirds credit, or possibly to no credit. It is desirable to clear up these issues, in order to avoid costly litigation with respect to the past, and to allow accurate investment planning for the movie industry in future years.

To achieve the objective set out above, the committee amendment, for past years, allows taxpayers to determine their investment credit on a film-by-film basis in accordance with certain statutory rules prescribed under the bill with respect to useful life and predominant foreign use, or to elect to take a 40-percent compromise credit for all their films, regardless of the actual useful life or foreign use of any particular film.

. . . .

As to the issue of useful life [of future films], taxpayers many [sic] take a two-thirds credit on all their films (regardless of the useful life of particular films), or they may elect to determine useful life on a film-by-film basis.

S.Rep. No. 94–938, 94th Cong., 2nd Sess. 185–86, *reprinted in* 1976 U.S.Code Cong. & Ad.News 3439, 3616–17 (Senate Report). *See* H.R.Rep. No. 94–658, 94th Cong., 2nd

Sess. 188–89, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2897, 3082–83 (House Report).

The amended statute provided that the ITC would be available with respect to motion picture films or videotapes "only if such film or tape is new section 38 property (*determined without regard to useful life* ) which is a qualified film." 26 U.S.C. § 48(k)(1)(A)(i) (emphasis added). "Qualified film" was defined as follows:

> For purposes of this subsection, the term "qualified film" means any motion picture film or video tape created primarily for use as public entertainment or for educational purposes. Such term does not include any film or tape *the market for which is primarily topical or is otherwise essentially transitory in nature.*

26 U.S.C. § 48(k)(1)(B) (emphasis added). The intended meaning of the italicized phrase is at the heart of this case.

The legislative history provides some clues as to Congress' intent. There is language indicating that Congress saw the set of "topical" and "transitory" films as generally contained within the old set of films with useful lives of less than three years: "A taxpayer is not to receive a credit for any films of a transitory or topical nature (because almost all of these films have a useful life of less than three years)." House Report at 196, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 3090; Senate Report at 193, *reprinted in* 1976 U.S. Code Cong. & Ad.News at 3625. This, however, does not solve our problem. It does not show *how far* back from the old, highly litigable three year line Congress chose to take its stand. The answer to that precise question appears in the following passage:

> For the future, as a general rule, under the committee bill, taxpayers are to receive two-thirds of a full credit for all their films regardless of the actual useful life (or foreign use) of any particular film. This rule will apply to all films

placed in service (i.e., initially released for public exhibition in any medium[ ) ] in taxable years beginning after December 31, 1974, regardless of whether any particular film had a useful life of 7 years or more (so that it would be entitled to a full credit if judged on an individual basis), or less than 3 years (so that it would not be entitled to any credit if judged separately). The credit is to be available only for "qualified films", i.e., motion picture films or television films or tapes created primarily for use as public entertainment (thus, for example, excluding industrial training films). Also, *the credit would be available for TV pilot films and dramatic or comedy series, such as "Mod Squad" or "The Mary Tyler Moore Show." However, the credit would not be available for films which were topical or transitory in nature, such as news shows, interview shows such as "Johnny Carson" or "Firing Line", or films or tapes of sports events, even though some of these shows might be shown in subsequent years.*

House Report at 189, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 3083–84 (emphasis added). *See* Senate Report at 186–87, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 3617–18.

Congress chose to define "topical or transitory" by listing programs which fit that description and others which did not. The examples chosen indicate that Congress meant to establish a new line well short of that which had caused the furor under the old law. This approach was consistent with the stated objective of avoiding costly litigation on the useful life issue. News reports, "Firing Line" interviews and broadcasts of sports events generally become dated almost as soon as they are aired. At least to the extent that it is an "interview show" dealing with current events in the world and in personalities' lives, "The Tonight Show" also becomes "old news" very quickly.[1] The comment

---

**1.** The dated material broadcast in all of the examples listed by Congress would tend to become unmarketable almost immediately after its initial broadcast *anywhere.* This fact is not-

regarding broadcasting of such shows "in subsequent years" implies that such shows' useful lives would normally be less than *one* year. By limiting its prohibition to quickly dated programs like these, Congress sought to lay the troublesome useful life issue to rest: only tapes with useful lives *clearly* much shorter than three years would be barred; the remainder, tapes whose status might have been uncertain under prior law, would qualify for the ITC.

*The Regulation*

On April 5, 1979, the Commissioner, pursuant to 26 U.S.C. § 38(b) (repealed 1984), promulgated new regulations designed to "provide necessary guidance to the motion picture and television industry for compliance with the law" regarding the ITC. 44 Fed.Reg. 20,416 (1979). Included in the package of regulations was the following definition:

> *Topical or transitory films and tapes.* [1] The term "qualified film" does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature. [2] A film or tape is topical or essentially transitory in nature if it primarily deals with events and personalities of current interest at the time the film or tape is placed in service. [3] It does not matter that a film or tape which is topical or essentially transitory in nature may be shown in subsequent years or is actually shown in subsequent years. [4] These films or tapes include news shows such as the evening news and news specials relating to current affairs, interview shows such as "The Tonight Show" or "Meet the Press", *game shows*, award shows, and shows consisting of sporting events. [5] Similarly, variety shows do not qualify for the credit since they present entertainers primarily as personalities of current interest, as op-

posed to dramatic or situation comedy shows which present entertainers as characters in a dramatization. [6] Topical or transitory films and tapes do not include, however, dramatized recreations of recent events.

Treas.Reg. § 1.48–8(a)(3)(iii) (1979) (emphasis added) (sentences numbered for ease of discussion).

The first sentence of the regulation essentially restates the language of the controlling statute, 26 U.S.C. § 48(k)(1)(B). The second sentence, like the statutory history quoted above, moves quickly from the "market" for a film or tape to a consideration of the nature of the film or tape, recognizing the logical connection between the nature of an item and the market for that item. This sentence establishes a test based upon content: nature (and hence, "market") is to be determined by whether the film or tape "primarily deals with events and personalities of current interest at the time the film or tape is placed in service." The third sentence simply notes that the nature of a film or tape is not altered by the fact that it may be shown in subsequent years.

The regulation's fourth sentence lists certain types of programs which are treated categorically as topical or transitory in nature and are thus excluded from the ITC. One item on the list is the category "game shows." [2] The fifth sentence purports to draw a line between "variety shows" (excluded from the ITC) and "dramatic or situation comedy shows" (not excluded) based upon the merely current or more lasting interest associated by the Commissioner with the respective contents of the two types of shows. The regulation's sixth sentence states that dramatized recreations of recent events are not topical or trans-

---

ed because it heightens the contrast between these examples and programs designed to be "bicycled" from town to town, a process explained below.

**2.** This category was not included in the regulation as originally proposed by the Commissioner. *See* Proposed Amendment to Treas.Reg.

§ 1.48–8(a)(3)(iii), 42 Fed.Reg. 63,792 (1977). Our disposition of this case makes it unnecessary for us to reach appellee's claim that the addition of game shows to the final regulation was procedurally improper. The tax court also did not reach this procedural claim.

itory. Such dramatizations thus qualify for the ITC under the regulation.

*Proceedings Below*

In tax returns for tax years ending on March 31, 1973, March 31, 1974 and March 31, 1977, Goodson-Todman claimed ITCs for costs incurred in production of TTTT. Credits were also claimed for tax years 1975, 1976 and 1978 and carried over or carried back to the three years whose tax returns were at issue. On March 26, 1981, the Commissioner issued a notice of deficiency to Goodson-Todman, stating in part:

> It is determined that the investment credits claimed in the amount of $32,059.00; $35,634.00; $41,547.00; $65,080.00; $113,416.00; and $152,285.00; respectively, (a total of $440,021.00) for the respective taxable years ended March 31, 1973 through March 31, 1978 inclusive, on video tapes of the program "To Tell The Truth" is disallowed because the property does not qualify for the investment credit under sections 38 and 48(k)(1)(B) of the Internal Revenue Code.

Record App. at 012. The Commissioner's reason for denying the ITC to Goodson-Todman was that TTTT was a game show categorically excluded from the ITC by Treasury Regulation section 1.48–8(a)(3)(iii).

The parties agree that Goodson-Todman is entitled to the following amounts of investment tax credit if the TTTT tapes qualify for the credit at all: 1973, $32,059; 1974, $35,634; 1975, $41,547; 1976, $130,160 (increased to this amount by the examining IRS agent); 1977, $113,416; and 1978, $152,285.

Goodson-Todman petitioned for a redetermination of tax deficiency on May 18, 1981. Following a short hearing held by the United States Tax Court, Sterrett, *J.*, in New York City on October 5, 1983, the parties submitted the case on briefs and a stipulation of facts and exhibits.[3] In a decision filed February 25, 1985, the tax court held, contrary to the Commissioner's finding, that the TTTT tapes did qualify for the ITC. *Goodson-Todman Enterprises v. Commissioner*, 84 T.C. 255, 256 (1985). From that decision, the Commissioner appeals. We have jurisdiction under 26 U.S.C.A. § 7482 (West Supp.1985).

*"To Tell The Truth"*

Before discussing the application of the Code subsection and Treasury regulation to TTTT and the class of game shows, we pause for this word about TTTT and its producers.

Goodson-Todman, a New York corporation, has been producing television game shows since the early 1950s. It began production of TTTT in 1956. TTTT was aired over the CBS network from 1956 through 1969 and then was taped for syndication to television stations throughout the United States between 1969 and 1980.

TTTT featured a master of ceremonies, or "emcee," and four celebrity panelists. Twice per half-hour show, the panel was confronted with groups of three contestants, one "real person" and two imposters pretending to be the real person. The emcee read a brief statement describing the real person, for example:

> I, John Fulton Short, an American, am a professional bullfighter and illustrator. I have fought bulls and exhibited my paintings in both Mexico and Spain where I am known as "El Yanqui." I fought my first bull in 1953, and, to date, I have fought and killed 53 bulls.
>
> Signed John Fulton Short

84 T.C. at 258. Having heard the statement, the panelists took turns questioning the contestants, trying to determine which one was the real person. Only the real person was required to answer questions truthfully. The imposters tried to mislead the panel by answering in the assumed identity of the real person. To preserve the element of surprise and to promote

---

**3.** The stipulation and exhibits were incorporated by reference into the opinion of the tax court. 84 T.C. at 256. The court decided the case on the basis of the stipulation and exhibits, a seven minute hearing and the parties' trial briefs, in which some objections to factual inferences were made. *Id.* at n. 2.

competition among members of the panel, the TTTT producers instructed panelists not to reveal any conclusions about contestants during this questioning phase.

When the time for questions was up, each of the panelists selected the contestant he or she believed was the real person, sometimes giving a serious or humorous reason for the choice. The emcee then asked the real person to identify himself: "Will the real John Fulton Short please stand up?" The real person stood up and then the real person and the imposters concluded the segment by briefly discussing details of their lives with the emcee and panel. The contestants were each guaranteed fifty dollars for appearing on the show. They shared a prize of five hundred dollars if none of the panelists voted for the real person.

The format of TTTT required contestants who would not be readily identifiable by the panel or by the audience. In selecting real people for TTTT, Goodson-Todman sought out individuals whose achievements or experiences made them interesting to the viewing public, but whose faces were not well known. In programs taped between April 1975 and March 1976, for example, the real people included a professional treasure hunter, a winner of ugly man contests, a record breaking long distance swimmer, a White House kennel keeper and an expert on worms.

During tax years ending March 31, 1970 through March 31, 1979, Goodson-Todman was producing tapes of TTTT for syndication. The distribution and licensing of the programs to television stations throughout the country were handled by an independent sales representative. Unlike the simultaneous national broadcast that might occur with a network program, these syndicated tapes were—in industry jargon—"bicycled" from one station to the next with the result that a particular tape might be shown in Philadelphia during one week, in Harrisburg the next week, in Pittsburgh the following week, and so on.

Goodson-Todman produced 195 taped TTTT shows—enough for thirty-nine weeks—in a typical year. For the balance of the fifty-two week season, each licensee station was obligated to broadcast reruns selected by Goodson-Todman from among the shows previously broadcast. Thus, roughly twenty-five percent of the TTTT shows were rerun on each station in the course of a season. The combination of rerunning and bicycling meant that individual shows not only traveled from town to town, but also made repeat visits to towns where they had previously been broadcast.

The taping of a TTTT episode often preceded the episode's initial broadcast on any station by as long as six months. Then, because of factors including the bicycling system and the addition of stations to the syndication list, initial and repeat broadcasts of a show on various stations would continue for two to three years thereafter. During the tax years in question, individual TTTT programs were broadcast approximately 110,000 times by television stations in the United States. About 1.38 percent of the programs were rerun by a station more than a year after the initial airing on that station.

With these facts in mind, we can now proceed to apply the Commissioner's regulation to TTTT.[4]

4. It is not contested on this appeal that production of TTTT represented a substantial, depreciable investment of the sort Congress generally intended to encourage through the ITC. *See* House Report at 192, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 3086; Senate Report at 189, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 3620–21.

We note, however, that Goodson-Todman employed a permanent staff of not less than fifteen people to prepare TTTT programs for taping. Each show required a cast of four panelists, one announcer, one emcee and six or nine contestants. The actual tapings were done by production crews—including camera operators, stagehands, wardrobe handlers, makeup artists, audio and lighting technicians—provided for a fee by a television network. In all, approximately fifty people were employed in the process of preparing, performing and taping each TTTT program.

All of the costs of producing TTTT were incurred by Goodson-Todman in the United States and reported in the corporation's federal income tax returns. The costs were recognized by

## Application of the Regulation

As explained above, the second sentence of section 1–48(a)(3)(iii) tests for "topical or transitory" nature by looking to a program's content: programs whose content is of merely "current interest" are "topical or transitory." Goodson-Todman argues, and the Commissioner does not seriously dispute here, that TTTT passes this content test with flying colors. First, TTTT's format demanded that its "real people" *not* be of such current interest that they would be readily identifiable to panelists or the audience. Second, the long delays between taping and the final broadcast precluded the use of current interest material. Episodes of TTTT were taped as long as six months prior to their first airing. The episodes were then "bicycled" from station to station around the country for a period of months or years. In order for TTTT to have the shelf life demanded by the syndication method of distribution, Goodson-Todman had to select "real people" who could generate durable interest in the various audiences which would view the program months and years after taping. TTTT's survival over eleven years of syndication is compelling testimony of the producer's success in this regard.

It is also noteworthy that the contracts with individual licensee stations required them to air reruns of TTTT approximately one-quarter of the broadcast year. Episodes had to be capable of maintaining viewer interest not only for initial showings long after the episodes were taped, but also for a second and sometimes a third showing to the same audience. This policy of required repeat broadcasts "strongly undercuts" the notion that TTTT was topical or transitory in nature, especially in light of the demands imposed by syndication. *See Cosby v. United States*, 8 Ct.Cl. 428, 444 (1985).

■ Because the content of TTTT was not topical or transitory, the crucial portion of the regulation becomes its fourth sentence. We must determine whether it was proper for the Commissioner to place TTTT with the entire category of "game shows" on a list of types of programs defined as topical or transitory and therefore excluded from the ITC.

■ The tax court felt that it was possible, and therefore necessary, to avoid the question of this provision's validity. 84 T.C. at 274 (citing, *e.g., United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 82, 827, 70 L.Ed.2d 792 (1982), and *Lykes Bros. Steamship Co. v. United States*, 513 F.2d 1342, 1350, 206 Ct.Cl. 354 (1975)). While we agree with the proposition that regulations should be construed, if possible, in such a way as to preserve their validity, we refuse to torture the plain language of this regulation in order to derive a meaning patently contrary to the Commissioner's actual intent.

The tax court reasoned that because the regulation should be construed as valid if possible and because the regulation would be invalid if it applied to all game shows including those whose markets were not primarily topical or transitory, the Commissioner must therefore have intended sentence four to bar only topical, transitory game shows. 84 T.C. at 274–77. This flies in the face of the Commissioner's own assertion here and in the tax court that he, himself, intended the fourth sentence of this regulation to impose a "flat rule" against ITCs for all game shows. It also has the effect of reading out of the regulation the very regulatory language that it purports to validate.

Any court faced with the regulation thus construed would be required to assess the topicality and transitoriness of each particular game show, that is, to proceed as if the fourth sentence did not exist. We will not seek such a pyrrhic victory for this regulation. Because we must, we will test its validity.

■ It has long been recognized that the Internal Revenue Service is the pri-

---

the Commissioner as capital in nature rather than as current expenses. They were recovered by depreciation over the economic lives of the tapes through the "income forecast method."

mary authority in construing the Internal Revenue Code. *Amato v. Western Union International,* 773 F.2d 1402, 1411 (2d Cir. 1985) (citing *Bob Jones Univ. v. United States,* 461 U.S. 574, 596, 103 S.Ct. 2017, 2031, 76 L.Ed.2d 157 (1983)). There is a strong presumption in favor of the validity of Treasury regulations. *Amato,* 773 F.2d at 1411; *Poirier & McLane Corp. v. Commissioner,* 547 F.2d 161, 167 (2d Cir.1976), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977). This deference increases when, as here, there was a specific grant of authority to promulgate regulations. *See United States v. Vogel Fertilizer Co.,* 455 U.S. at 24, 102 S.Ct. at 827; *Commissioner v. Portland Cement Co. of Utah,* 450 U.S. 156, 165–69, 101 S.Ct. 1037, 1043–45, 67 L.Ed.2d 140 (1981). A challenger to a Treasury regulation will prevail, however, if he establishes that a regulation is unreasonable or .plainly inconsistent with the Code itself. *Bingler v. Johnson,* 394 U.S. 741, 750, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969); *Amato,* 773 F.2d at 1411; *Solomon v. Commissioner,* 570 F.2d 28, 32 n. 4 (2d Cir.1977).

▮ It is thus apparent that the deference paid to Treasury regulations is not boundless. The Commissioner's interpretation of the Code is subject to review by the courts, whose "duty ... is 'to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.'" *Commissioner v. Engle,* 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984) (quoting *NLRB v. Lion Oil Co.,* 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, *J.,* concurring in part and dissenting in part)). The Supreme Court in *Engle* rejected the Commissioner's interpretation of the Code, even though it was not facially irrational, because it was unreasonable and out of harmony with the legislative intent. 464 U.S. at 217–25, 104 S.Ct. at 604–09. The interpretation had been codified by the Commissioner in a proposed Treasury regulation. *Id.* at 215 n. 11, 104 S.Ct. at 603 n. 11. The Supreme Court's testing of the

interpretation against both the letter and the spirit of the revenue statutes mirrored the approach we used recently in *LeCroy Research Systems Corp. v. Commissioner,* 751 F.2d 123, 126 (2d Cir.1984) (upholding regulation which was "within both the express authority and the spirit of the statute").

▮ A Treasury regulation may therefore be declared invalid only if it is unreasonable or clearly contrary to the language or spirit of the statute it purports to implement. The deference which is the basis for this standard implies that the failure of a regulation to provide for every single exceptional case would not be an adequate ground for invalidation. Thus, if TTTT were the only game show that was not topical or transitory in nature, the fact that TTTT was denied the ITC by sentence four might not support the invalidation of the sentence. As it happens, the record of this case indicates that many game shows are no more topical and transitory than TTTT.

▮ Among the joint exhibits stipulated into the record of the tax court by the parties are M. Fabe, *TV Game Shows* (1979), JT Ex. 4–D (Fabe), and a lengthy excerpt from J. Greenfield, *Television: The First Fifty Years* (1977), JT Ex. 5–E (Greenfield). Both works support our conclusion that the character and content of game shows preclude their categorical classification as topical and transitory.

Fabe and Greenfield analogize the audience appeal of game shows to that of dramatic television series. Game shows are said to be popular because they portray "the drama of a nice person struggling to emerge triumphant from a difficult ordeal," Fabe at 60, and because they have the "appeal inherent in putting ordinary people into crisis situations." Greenfield at 197. According to Greenfield, "both the game show and the soap opera incorporate an appeal to their audiences' thirst for some kind of passion, even the vicarious variety, and to their need for a sense, however artificial, of dramatic peaks in the lives of 'real' people.... [Both] blend real-

ity and fantasy to attract an audience." *Id.* at 191–92.

The content of many game shows renders them more enduring than the kinds of programs Congress chose to exclude from the ITC. To the extent that the questions asked on game shows are serious, they are very likely to draw on "common knowledge," which may include recent headlines, but seems to rely more heavily on other less evanescent sources. *Cf.* Fabe at 56. For example, sample questions asked on "You Bet Your Life," *id.* at 145–46, and "Jeopardy," *id.* at 242, demanded knowledge of science, history, literature and foreign languages.[5] The questions set forth in the margin would be as valid a test of such general knowledge today as they were when they were first posed years ago.

This timeless quality is evident in other game show questions as well. On "Family Fued," contestants try to match their answers to those given by a sample group in response to questions like: "Name a famous explorer." *Id.* at 269.[6] Certain game shows required contestants to guess the name of a musical selection ("Name That Tune"), *id.* at 153–57, or to discern a secret word ("Password"), *id.* at 221–25.[7] Questions on shows such as "The Matchgame" and "The Hollywood Squares" were designed less to elicit knowledgeable answers than to be jokes in themselves or to provide stars with openings for cute rejoinders. *Id.* at 58–59, 245–47. On some shows, including TTTT, "What's My Line?" and Groucho Marx's "You Bet Your Life," the game itself might have been less important to the program's success than the "quips of the celebrity panelists" or of the host. *Id.* at 142; Greenfield at 193. Many game shows, like TTTT, were distributed over periods of years through syndication.[8]

5. Fabe gives the following as examples of questions used on "You Bet Your Life."
   1. Who was our only bachelor President? ANSWER: James Buchanan.
   2. What is the name of the town in Ontario, Canada, where the Dionne quintuplets were born? ANSWER: Calendar.
   3. What is the French word for potato? ANSWER: *Pomme de terre.*
   4. What river separates Manchuria from Korea? ANSWER: Yalu.
   5. Who was the ringleader of the mutiny on the Bounty? ANSWER: Fletcher Christian.
   Fabe at 145.
   The following are examples of "Jeopardy" questions. This game's format actually called for divulging answers in various knowledge categories and then requiring the contestant to frame a response in the form of an appropriate question.
   [1] "Odds and Ends"
   A Mrs. Myra Franklin set a record by seeing this Julie Andrews film more than 900 times.
   *What is* The Sound of Music?
   [2] "Famous Quotes"
   Caesar's three-word report after he routed Ponticus at first assault.
   *What is "Veni, vidi, vici?" (I came, I saw, I conquered.)*
   [3] "Emmy Comedians"
   Bishop Sheen, dubbed "Uncle Fultie," competed with his show in fifties.
   *Who is Milton Berle?*
   [4] "$$$"

The two bills scrambled by inept counterfeiter who puts Andrew Jackson on face, Lincoln Memorial on back.
   *What are $20 and $5 bills?*
   [5] "Animals"
   Weighing .000035 of an ounce as new embryo, it grows to twenty-nine tons in first year.
   *What is a baby (blue) whale?*
   Fabe at 242.

6. The following are additional examples of questions used on "Family Fued."
   1. Name something you find at a picnic.
   2. Name an Indian tribe.
   3. Name a sport where gloves are worn.
   4. Name something you adjust on a television set.
   5. Name a year during World War II.
   Fabe at 272.

7. The "password" is not to be confused with the "secret word" whose inadvertent use by a contestant brought down a wooden, mustachioed duck and a bonus prize on "You Bet Your Life." *See* Fabe at 142–43.

8. The following are some notable examples of programs that first aired on television in the 1950s and later spent periods of time in syndication: "You Bet Your Life" entered syndication in 1963 and was still running as of Fabe's date of writing, Fabe at 301; "Beat the Clock" was in syndication from 1969–75, *id.* at 306; "What's My Line?" was syndicated from 1968–74, *id.* at 307; "I've Got A Secret" was in syndication from 1972–75, *id.* at 311; and a version of "Name

From this brief survey, it is clear that TTTT was far from alone among game shows in being neither primarily topical nor essentially transitory in nature. Although it is possible to conceive of topical or transitory game shows—programs which deal primarily with current headlines for example—such shows would seem to be the exception rather than the rule, particularly among those game shows distributed, like TTTT, through syndication. As noted above, syndication demands products which will not become dated while they are being "bicycled" from one customer station to the next. Based upon even this limited sampling of game shows' content and characteristics, we can say with confidence that it was unreasonable of the Commissioner by regulation to exclude such shows as a class from the ITC.

In his defense, the Commissioner argues that Congress' use of categorical examples in the legislative history of section 48(k) justified the Commissioner's use of categories in sentence four of his regulation. The problem with this assertion of a broad power to add new categories to Congress' list is that it ignores the *ejusdem generis* principle of construction: the rule that one may only reasonably expand a non-comprehensive list by adding new items which are similar to those already on the list. *See, e.g., DiLeo v. Greenfield*, 541 F.2d 949, 954 (2d Cir.1976). As explained above, the programs on Congress' list of exclusions share the characteristic that their content generally becomes dated very soon after an initial broadcast on any station. The *ejusdem generis* principle prevents the Commissioner from adding to that list a category of programs, like game shows, which do not share that common characteristic.

Furthermore, the items on Congress' entire list of programs eligible and ineligible for the ITC—pilot films, dramatic and comedy series, news shows, interview shows and films of sports events—are distinguishable as topical and transitory *vel non*

based upon their *content*, not their *form*. This is true even of the item "interview shows," which seems to refer to form. While an interview dealing with current events clearly fits within this category, it could not reasonably be argued that a dramatized historical interview, or the interviews that comprise part of a lengthy filmed biography would also fit.

The categorical exclusion of programs because they happen to be presented in the form of a game is plainly unreasonable. It would make as much sense to exclude from the ITC all programs which are two hours long, all those printed on 16 millimeter film, or all programs introduced by a host. Certainly it would cut down on the Commissioner's workload if such a bright line could be drawn. But, as the Supreme Court forcefully stated it in *Engle*, the Commissioner may not "make [a tax] statute 'simpler to administer' ... by ignoring the language of the statute, the views of those who sought its enactment, and the purpose they articulated." 464 U.S. at 227, 104 S.Ct. at 609. The Commissioner's grant of authority, after all, requires him to regulate within the "purposes" of the ITC statutes. *See* 26 U.S.C. § 38(b) (repealed 1984).

The inclusion of game shows in sentence four of the regulation seems to have been based on an overly expansive reading by the Commissioner of the legislative history's phrase "films or tapes of sports events." Apparently it was that phrase which led the Commissioner to the "conclusion that Congress did not intend that *a mere video and sound recording of a game,* performance or event would automatically qualify for the [ITC]." *See* preface to final regulation, 44 Fed.Reg. 20,416 (1979) (emphasis added). The Commissioner perhaps equated "game shows" with broadcasts of football "games" or baseball "games," ignoring the many distinctions between them. Among other things, foot-

---

That Tune" was running in syndication at Fabe's date of writing, *id.* at 313.

"Password," "Jeopardy," "The Hollywood Squares," "The Matchgame" and "Family Feud"

were also distributed via syndication for varying periods of time. *Id.* at 322, 323, 325, 328, 330.

ball and baseball games are played independently of whether they are televised or not, are watched by an audience generally interested in the outcome, and generally become dated very soon after they are aired. Game shows are produced solely for broadcast, are watched for their entertainment value without regard to which contestants win or lose, and may be aired many times in many different towns over a period of months or years. It is not rational to treat tapes or films of both types of "games" alike for purposes of the ITC, nor can it be imagined that Congress had a game like TTTT in mind when it spoke of "sports events." We hold that sentence four of Treasury Regulation section 1.48–8(a)(3)(iii) is invalid insofar as it includes game shows.

■ We agree with the tax court that TTTT qualifies for the ITC under the applicable remainder of the regulation and under the controlling statute itself.[9] We have noted above that there is no serious dispute as to TTTT's qualification under the content test set forth in the regulation's second sentence. The only remaining question, therefore, is whether the program is barred from the ITC by the first sentence of the regulation, which simply restates the language of the statute in excluding films or tapes *"the market for which* is primarily topical or is otherwise essentially transitory in nature." 26 U.S.C. § 48(k)(1)(B) (emphasis added).

The Commissioner, despite the contrary implications of the succeeding sentences of his regulation, argues now that this first sentence and the statute itself establish a separate "market test" which is independent of the content of the film or tape. The Commissioner seeks to impose the old three year useful life minimum, arguing that a film or tape not likely to be marketable for that length of time is intended by Congress to be excluded from the ITC. We reject this notion.

As the Commissioner urges us to remember, the market for a particular film or tape must be gauged for tax purposes at the time the work is first placed in service. From that vantage point, as the Congress, desiring to avoid future litigation over the useful life issue, recognized, it is possible—based upon program content—to determine which films and tapes are likely to become dated within days or hours after initial airing and which are likely to be more durable, but it is impossible—on any reasonable basis—to say which will survive thirty-six months, and which thirty-seven. Therefore, the three year minimum life rule was eliminated. Congress chose instead to draw its bright line between films and tapes likely to be dated very quickly and all other films and tapes. The three year minimum the Commissioner seeks to imply here is also contrary to the express language of the statute, which treats films and tapes as eligible for the ITC "without regard to useful life," 26 U.S.C. § 48(k)(1)(A)(i).

■ We therefore decline the Commissioner's invitation to construe "topical or ... transitory" market as meaning "market lasting anything less than three years." Accepting such an invitation would require us to read back into the statute a provision that Congress clearly decided to delete from former law when it enacted the subsection at issue here. If Congress had wanted to retain a strict minimum useful life test for films and tapes, it could easily have done so. *See* 26 U.S.C. § 48(k)(3)(A) (providing that taxpayer may elect to receive ITC based on actual useful life of tape or film, with no credit allowed if useful life is less than three years).

Because TTTT qualifies for the ITC under both the valid portions of the regulation and the language of the controlling statute, we hold that Goodson-Todman is entitled to the ITC for the years at issue in the amounts agreed upon by both parties.

The decision of the United States Tax Court, as modified herein, is affirmed.

9. We note that the tax court reached this conclusion after construing the game show exclusion out of the regulation rather than invalidating it. *See* 84 T.C. at 277–78.