PEPCOL MANUFACTURING CO., PETITIONER *v.*
COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 38290-86.    Filed February 5, 1992.

*Jay P. Tarshis,* for petitioner.
*Lawrence C. Letkewicz, Lauren W. Gore,* and *Vijay Rajan,* for respondent.

OPINION

TANNENWALD, *Judge:*[1] Respondent determined a deficiency of $138,340 in petitioner's Federal income tax for the taxable year ending February 29, 1980. The issue for decision is whether petitioner's bone-processing equipment qualifies for the investment tax credit as energy property under section 48(l)(6).[2]

This case was submitted to the Court fully stipulated pursuant to Rule 122. The stipulated facts are found accordingly.

At the time the petition in this case was filed, petitioner's principal office was located in Denver, Colorado. For its taxable year ending February 29, 1980, petitioner filed a timely Federal income tax return with the Internal Revenue Service Center in Ogden, Utah.

Petitioner engages in the processing of various animal parts. The animal parts obtained by petitioner are a waste from the meat fabrication industry. During the taxable year at issue, petitioner operated three different types of processing facilities. Two of petitioner's operations are typical rendering facilities.

---

[1]This case was reassigned to Judge Tannenwald by order of the Chief Judge dated Oct. 29, 1991.
[2]All statutory references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The third type of facility operated by petitioner in the year at issue processes only animal bones. This bone-processing facility was constructed in 1979 and placed in service in January 1980. It is physically separated from the rendering operations. Prior to the year at issue, petitioner did not operate a facility which solely processed animal bones.

The primary product of the bone-processing facility is gelatin bone. Substantially all of the gelatin bone is sold to the photographic industry as a raw material for use as a coating on film. Other uses for gelatin bone include coating of pharmaceutical products as well as an ingredient in food products such as gelatin.

Petitioner constructed the bone-processing facility to utilize an advance in the method of production, processing, and marketing of meat known as "boxed-beef" fabrication. Boxed-beef is meat which has been cut from the bone, trimmed, and is ready for sale to the retail consumer. In this process, the animal is slaughtered, dressed, and packaged for human consumption in a single processing facility. A substantial increase occurred in the volume of animal bones produced at a centralized location as a result of boxed-beef fabrication. The typical rendering process is unable to consume the volume of bones produced by boxed-beef fabricators due to the decreased protein content of the meat and bone meal and the need for a typical rendering process to use the proper mixture of animal bones and other materials. Further, animal bones are not easily transportable due to potential contamination. The bones must be disposed of quickly after the animal is slaughtered and dressed. These factors resulted in the inability of boxed-beef fabricators to utilize or dispose of the entire volume of animal bones through established commercial channels.

Petitioner's bone processing starts with the receipt of the animal bones from the boxed-beef fabricators. The animal bones are then chopped and ground into a fine particle consistency. The bone particle is then made into a slurry by adding water. The mixture is heated and pumped into a decanter which separates the slurry into liquids and solids through a centrifugal process. The liquid consists of fats while the solids are the remaining bone material. After separation, the bone material is dried and sized, with the larger pieces of

bone material being used for gelatin bone. The smaller bone pieces are used for bone meal.

In processing animal bones, there is no commercially marketable product produced prior to the production of gelatin bone. Further, petitioner's bone-processing facility does not process animal bones beyond the point at which gelatin bone is produced.

We must decide whether petitioner's facility for processing animal bones constitutes "recycling equipment" as defined in section 48(l)(6) and is therefore entitled to the investment credit as "energy property" as provided in section 48(l)(2)(A)-(iv). Section 48(l)(6) reads as follows:

(6) RECYCLING EQUIPMENT.—

(A) IN GENERAL.—The term "recycling equipment" means any equipment which is used exclusively—

(i) to sort and prepare solid waste for recycling, or

(ii) in the recycling of solid waste.

(B) CERTAIN EQUIPMENT NOT INCLUDED.—The term recycling equipment does not include—

(i) any equipment used in a process after the first marketable product is produced, or

(ii) in the case of recycling iron or steel, any equipment used to reduce the waste to a molten state and in any process thereafter.

(C) 10 PERCENT VIRGIN MATERIAL ALLOWED.—Any equipment used in the recycling of material which includes some virgin materials shall not be treated as failing to meet the exclusive use requirements of subparagraph (A) if the amount of such virgin materials is 10 percent or less.

(D) CERTAIN EQUIPMENT INCLUDED.—The term "recycling equipment" includes any equipment which is used in the conversion of solid waste into a fuel or into useful energy such as steam, electricity, or hot water.

Section 38(b) states that the Secretary "shall provide such regulations as may be necessary to carry out the purposes" of subpart B, which includes section 48.

Pursuant to that authority, section 1.48-9, Income Tax Regs., was promulgated and reads, in pertinent part, as follows:

(g) Recycling equipment—(1) In general. Recycling equipment is equipment used exclusively to sort and prepare, or recycle, solid waste (*other than animal waste*) to recover usable raw materials ("recovery equipment") or to convert solid waste (*including animal waste*) into fuel or other useful forms of energy ("conversion equipment"). Recycling equipment may include certain other onsite related equipment.

(2) Recovery equipment. Recovery equipment includes equipment that—

(i) Separates solid waste from a mixture of waste,

(ii) Applies a thermal, mechanical, or chemical treatment to solid waste to ensure the waste will properly respond to recycling, or

(iii) Recycles solid waste to recover usable raw materials, but not beyond occurrence of the first of the following:

(A) The point at which a material has been created that can be used in beginning the fabrication of an end-product in the same way as materials from a virgin substance. Examples are the fiber stage in textile recycling, the newsprint or paperboard stage in paper recycling, and the ingot stage for other metals (other than iron or steel). In the case of recycling iron or steel, recycling equipment does not include any equipment used to reduce solid waste to a molten state or any process thereafter.

(B) The point at which the material is a marketable product (i.e., has a value other than for recycling) even if the material is not marketed by the taxpayer at that point.

[Emphasis added.]

The requirements for "recycling equipment" can be summarized as follows:

(1) The process must constitute recycling.

(2) The equipment must be used exclusively to process or sort and prepare solid waste for processing.

(3) The item produced in the process must be the first marketable product.

(4) The product to be processed cannot contain more than 10 percent virgin material.

The parties agree that requirements (3) and (4) are met. Petitioner argues that its processing of animal bones constitutes recycling of solid waste and that the exclusion of animal waste from the definition of recovery equipment by the parenthetical clause in section 1.48-9(g)(1), Income Tax Regs., is invalid. Respondent, conceding that animal bone is a solid waste, initially contends that the process does not constitute recycling because: (a) The gelatin bone is part of an ongoing process of original utilization of the animal parts and/or (b) the gelatin bone is used in an end-product which is not the same type as, or similar to, the processed animal parts. Such being the case, respondent argues that the question of the validity of the exclusion of animal waste contained in the regulations need not be reached. Respondent goes on to argue that, if we should conclude that petitioner's process constitutes recycling, the exclusion of animal waste in the parenthetical clause of the regulation is a valid exercise of the authority granted to the Secretary of the Treasury by section 38(b). As will sub-

sequently appear, respondent's two positions are substantially intertwined.

In keeping with the principle that we should, if possible, avoid a construction which will question the validity of a regulation, see *Bhada v. Commissioner,* 89 T.C. 959, 972 (1987), affd. 892 F.2d 39 (6th Cir. 1989), we turn first to respondent's initial contention. That contention reflects the following rationale set forth in Technical Advice Memorandum (TAM) 8138016 (June 18, 1981) which dealt with the rendering of animal parts:

> In the final regulations the parenthetical references to animal waste were added to clarify but not change the meaning of the term recycling equipment for purposes of the energy credit. The term animal waste is intended to include the type of waste material collected and used by the rendering industry.

In this "clarification", the TAM explains the exclusion as follows:

> With respect to equipment used to recover useable raw materials from solid waste (recovery equipment), the intent of Congress is indicated by its reference, in the committee report, to post-consumer waste materials and industrial fabricating waste. A further indication of the intent of Congress is provided by the examples included in the committee report of eligible equipment used in the actual recycling function to recover useable recyclable materials. The examples include equipment to produce ingots in metal recycling, fibers in textiles, and newsprint or paperboard in the paper industry. All of these examples involve the recovery of useable raw materials that can be processed back into the same type or similar end product.

Based upon this rationale,[3] respondent argues that the use of petitioner's equipment does not constitute recycling because (a) processing of the animal bone into gelatin bone is part of a forward-moving, one-way operation in which the boxed-beef fabricator first trims the meat from the bone and then passes the bone on to petitioner to complete the second phase of the operation, and/or (b) unlike metal waste which is processed back into metal and used in metal products, textile fibers waste which are processed back into textile fiber and used in textile products, or paper products which are processed back

---

[3] We note that Technical Advice Memorandums are not precedent. Sec. 6110(j)(3); *Estate of Doherty v. Commissioner,* 95 T.C. 446, 456 (1990), on appeal (10th Cir., Aug. 5, 1991).

into paper and used in paper products, the gelatin bone processed from the meat parts is not used in a meat product.

The parties have indulged in a semantical orgy, citing the Court numerous dictionary definitions for the purpose of proving, in the case of petitioner, that the word "recycling" has an everyday ordinary meaning in order to apply the usual rule of statutory construction and, in the case of respondent, that the word "recycling" has no such meaning thereby affording more leeway to the scope of the statute and regulation. We find it unnecessary to enter the esoteric world of lexigraphy and choose between the numerous definitions that have been thrust upon us because we are satisfied that any reasonable reading of the statutory provisions dealing with "recycling equipment", in light of the natural import of the word "recycle" and the legislative history, supports petitioner's substantive position herein. See *Addison v. Holly Hill Co.,* 322 U.S. 607, 618 (1944) ("After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him."); *Helvering v. Horst,* 311 U.S. 112, 118 (1940) ("Common understanding and experience are the touchstones for the interpretation of the revenue laws"). Section 48(l)(6) speaks only in terms of recycling solid waste, and section 1.48-9(g)(1) and 1.48-9(g)(2)(iii), Income Tax Regs., require only the recovery of "usable raw materials". Respondent does not contend that animal bones are not "usable raw materials".

No mention is made in the Code, regulations, or legislative history of a same type or similar end-product requirement. To be sure, the legislative history sets forth end-product examples of metal waste, textile fibers, and paper products as reflected in TAM 81-38-016, see *supra* p. 131, but there is not the slightest indication in such history of an end-product requirement. See S. Rept. 95-529 (1977), 1978-3 C.B. (Vol. 2) 199; see also sec. 1.48-9(g)(2)(iii)(A), Income Tax Regs. Section 48(l)(6)(B)(i) provides that any equipment used after the first marketable product is produced will fail to be recycling equipment. There is no provision that also requires the first marketable product produced by the recycling process to be the same as the solid waste. Moreover, the fact that the regulation itself recognizes

the conversion of "animal waste" as a function of conversion equipment, section 1.48-9(g)(1), Income Tax Regs., *supra* pp. 129-130, and the fact that section 48(l)(6)(D) includes conversion equipment within the term "recycling equipment" makes respondent's position as to the meaning of that term as applied to animal waste anomalous, to say the least. Indeed, the addition of conversion equipment by Congress to the definition of "recycling equipment" indicates an expansive view of the meaning of that term which is inconsistent with respondent's approach herein. Such an expansive view coincides with the legislative purpose of extending the investment tax credit to energy property and of other legislative enactments dealing with the problems created by the existence of waste materials and the need for environmental as well as conservation-effective methods of disposal. Energy Tax Act of 1978, Pub. L. 95-618, 92 Stat. 3174; H. Rept. 899, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.C.C.A.N. 3608-3609. We reject respondent's attempt to narrow the legislative purpose to energy and natural resource conservation and ignore the alleviation of landfill and incinerator problems which result in unhealthy conditions.

We conclude that, at least in the absence of respondent's regulation, petitioner's processing of animal bones. constitutes recycling so that its equipment is "recycling equipment" within the meaning of section 48(l)(6). The question remains whether the language excluding animal parts from the definition of recovery equipment in section 1.48-9(g)(1), Income Tax Regs., see *supra* pp. 129-130, is a permissible interpretation of the statute.

Much of our earlier analysis is applicable to the issue of the validity of the exclusion, but we think it appropriate to deal with some further considerations which respondent has advanced with the observation that some of those considerations are also relevant to our earlier analysis.

Initially, we note that section 1.48-9(g), Income Tax Regs., is a "legislative regulation" promulgated pursuant to a specific delegation of legislative authority in section 38(b). In general, Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes, and should not be overruled except for weighty reasons". *Bingler v. Johnson,* 394 U.S. 741, 750 (1969); *Goodson-Todman Enter-*

*prises v. Commissioner,* 84 T.C. 255, 274-275 (1985), affd. 784 F.2d 66 (2d Cir. 1986). Legislative regulations are entitled to an especially high degree of deference. *Phillips Petroleum Co. v. Commissioner,* 97 T.C. 30, 34 (1991). However, if a legislative regulation is inconsistent with the statutory provision which it seeks to implement, it cannot be sustained. *Goodson-Todman Enterprises v. Commissioner, supra.* See also *Jackson Family Foundation v. Commissioner,* 97 T.C. 534 (1991).

Respondent's dual use of the term "solid waste" in the regulations conflicts with the use of the term in the Code. As we have previously pointed out, see *supra* pp. 132-133, section 48(l)(6) makes two nondistinguishable references to the term "solid waste". Section 48(l)(6)(A)(ii) refers to solid waste in the context of recycling, and section 48(l)(6)(D) uses the same term to refer to the conversion of solid waste into a fuel or other useful energy. The regulations, however, differentiate between the two references to the term "solid waste". Section 1.48-9 (g)(1), Income Tax Regs., excludes animal waste from the definition of recycling of solid waste for purposes of recycling. By way of a similar parenthetical, the same section of the regulation specifically includes animal waste in the definition of solid waste for purposes of the conversion of solid waste into fuel or other useful forms of energy. No explanation is offered by respondent for this disparate treatment between the Code and regulation, nor is any to be found.

Second, the section 48 regulations are inconsistent. The animal waste exclusion in section 1.48-9(g)(1), Income Tax Regs., conflicts with the definition of "solid waste" in section 1.48-9(g)(5), Income Tax Regs. In defining the term "solid waste," section 1.48-9(g)(5), Income Tax Regs., states:

(5) Solid Waste. (i) The term "solid waste" has the same meaning as in §1.103-8(f)(2)(ii)(*b*), subject to the following exceptions and other rules of this subparagraph (5):

(A) The date the equipment is placed in service is substituted in the first sentence of §1.103-8(f)(2)(ii)(*b*) for the date of issue of the obligations, and

(B) Material that has a market value at the place it is located only by reason of its value for recycling is not considered to have a market value.

Section 1.103-8(f)(2)(ii)(*b*), Income Tax Regs., defines "solid waste" as follows:

(*b*) The term "solid waste" shall have the same meaning as in section 203(4) of the Solid Waste Disposal Act (42 U.S.C. § 3252(4)), except that for purposes of this paragraph, material will not qualify as solid waste unless, on the date of issue of the obligations issued to provide the facility to dispose of such waste material, it is property which is useless, unused, unwanted, or discarded solid material which has no market or other value at the place where it is located. * * * Section 203(4) of the Solid Waste Disposal Act provides that:

(4) The term "solid waste" means garbage, refuse, and other discarded solid materials, including solid-waste materials resulting from industrial, commercial, and *agricultural operations* * * * [Emphasis added.]

The fact that section 48(l)(12) specifies that "The term 'industrial' includes agricultural" is a further indication of the broad scope of the term "solid waste". See H. Rept. 95-496, Part III (1977), 1978-3 C.B. (Vol. 2) 180. This view is reinforced by the legislative history of the Solid Waste Disposal Act, Pub. L. 89-272, tit. II, 79 Stat. 992 (1965), which clearly indicates that solid waste includes animal bones. The House report explains:

Solid waste collection and disposal activities create one of the most serious and most neglected aspects of environmental contamination affecting public health and welfare. Solid wastes include a great variety of things that individuals, manufacturers, commercial establishments, and communities discard as no longer usable, such as garbage, rubbish, ashes, street refuse, * * * and the *wastes from slaughterhouses,* canneries, manufacturing plants, and hospitals. * * * [H. Rept. 899, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.C.C.A.N. 3608, 3614; emphasis added.]

Third, the Code and legislative history of section 48 provide special treatment to specific items without any provision for excluding animal waste. Thus, section 48(l)(6), which defines recycling equipment, provides special rules for each of the following: The first marketable product to be produced (sec. 48(l)(6)(B)(i)); iron and steel (sec. 48(l)(6)(B)(ii)); a specific set amount of virgin material allowed (sec. 48(l)(6)(C)); and the use of recycling equipment to convert solid waste into fuel or other useful energy (sec. 48(l)(6)(D)). If Congress intended to treat the recycling of animal wastes differently than the recycling of other types of solid waste for purposes of the investment tax credit, then it would have indicated such an intent. Cf. *Addison v. Holly Hill Co., supra.* Indeed, if respondent's open-end process/end-product interpretation of recycling were correct, there would be few, if any, agricultural products which could be recycled other than by a conversion-to-

fuel process. Clearly, animal parts cannot be recovered to produce a cow, nut shells to produce nuts, pea pods to produce peas, or corn husks to produce corn.

Lastly, we note that, in Rev. Rul. 84-64, 1984-1 C.B. 20, equipment used by a typical renderer to produce commercial products from animal parts, such as fat, bone, offal, and feathers, is determined not to be recycling equipment. The only basis provided for this ruling is the parenthetical exclusion of animal waste in section 1.48-9(g)(1), Income Tax Regs. When the regulation was issued in proposed form, see 45 Fed. Reg. 62496 (Sept. 19, 1980), it contained no separate reference to animal waste. When the regulation was issued in final form in Treasury Decision 7765, 1981-1 C.B. 22, 26, the accompanying comment stated:

> In response to a request for clarification, the final rules specify that equipment that processes animal waste is not recycling equipment.

Respondent seizes upon the word "clarification" to support his argument that the animal waste exclusion is simply interpretative of an ambiguity in the phrase "solid waste". As is the case with TAM 8138016, see *supra* p. 131, this is nothing more than a bootstrap argument and is not worthy of further comment.[4]

Moreover, T.D. 7765 is explicit that the definition of solid waste in section 48 mirrors the definition in section 103 with only three exceptions. Thus, the preamble to T.D. 7765 states:

> There is no indication that Congress intended to alter the tax definition of solid waste * * *
>
>     *     *     *     *     *     *     *
>
> However, Congress clearly intended certain changes be made in the tax definition of solid waste for purposes of the energy credit. The section 103 regulation excludes from the definition of solid waste any substance that may be sold (*i.e.*, for value) to an unrelated third party. Under this rule, virtually none of the items identified in the Senate Report, such as scrap metal, newsprint, and fibers, would be considered solid waste, since all of these items have a market value at least equal to the price a recycler would pay for the material. * * *

Therefore, the proposed regulation defined solid waste by beginning with the section 103 definition but has modified it by deleting an irrelevant

---

[4]Although entitled to consideration, revenue rulings are also not precedent. *Stubbs, Overbeck & Associates v. United States,* 445 F.2d 1142, 1146-1147 (5th Cir. 1971).

reference to the date of issue of obligations, by adding a provision which indicates that if the market value of material is attributable only to its recycling use the material is not considered to have a market value, and by permitting the recycled material to include not more than 10 percent virgin material during a taxable year.
    [1981-1 C.B. at 26.]

Reference to the section 103 regulation reveals no separate treatment of animal waste in the definition of solid waste. See *supra* pp. 134-135.

The foregoing analysis clearly supports the view that there is nothing in the statutory language or the legislative history to suggest that Congress had an unarticulated agenda to treat "animal waste" as a separate category of solid waste not eligible for recycling.

The long and short of the matter is that the animal waste exclusion in section 1.48-9(g)(1), Income Tax Regs., imposes a qualification to the statutory term "solid waste" which does not harmonize with the statute or with its origin and purpose. See *United States v. Vogel Fertilizer Co.,* 455 U.S. 16 (1982); *Goodson-Todman Enterprises v. Commissioner,* 84 T.C. at 279. Nor does the fact that the statute and legislative history do not specifically address the subject of animal waste militate against our conclusion. Cf. *King v. St. Vincent's Hospital,* 502 U.S. ___ (Dec. 16, 1991).

We hold that the exclusion of "animal waste" from "solid waste" in the definition of "recovery equipment" in section 1.48-9(g)(1), Income Tax Regs., is invalid.

*Decision will be entered for petitioner.*

Reviewed by the Court.

NIMS, CHABOT, KÖRNER, SHIELDS, HAMBLEN, COHEN, SWIFT, JACOBS, GERBER, WRIGHT, PARR, WELLS, RUWE, WHALEN, COLVIN, and BEGHE, *JJ.,* agree with the majority opinion.

---

RUWE, *J.,* concurring: The process that transforms animals into finished products such as meat, hides, bone gelatin, and bone meal, appears to be an ongoing process that transforms raw materials (animals) into saleable products. Based on the facts presented, it is unclear whether *any* solid animal parts

produced in the meat fabrication process are traditionally removed and disposed of as waste. Without such a finding, I would normally not be able to conclude that a legislative regulation excluding animal parts from being considered "solid waste" was arbitrary, capricious, or manifestly contrary to the statute which is the standard that must be met for invalidating a legislative regulation. See *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843-844 (1984); *Peoples Federal Savings & Loan Association of Sidney v. Commissioner,* 948 F.2d 289 (6th Cir. 1991).

I am not convinced that section 1.48-9, Income Tax Regs., requires the result reached by the majority. To be sure, the use of the term "animal waste" in the regulation is confusing, but the result of excluding all animal parts from being considered as "solid waste", for purposes of defining "recovery equipment", is not unreasonable if all parts of the slaughtered animal are traditionally used as raw material to be processed into a finished product. The regulation's inclusion of "animal waste" as "solid waste", for purposes of defining "conversion equipment", could be justified on the grounds that if animal parts are converted to fuel or energy, their use for that purpose is so unusual that it justifies the conclusion that such animal parts had no other use in a forwarding-moving process of transforming raw materials into a finished product. Under such circumstances, animal parts converted into fuel or energy could be considered waste and the equipment used to convert them into fuel or energy would, by statute, be included within the term "recycling equipment".

Any possibility of justifying the validity of the regulation by employing this rationale and then applying the regulation to the facts in this case was effectively eliminated by respondent's concession that animal bone is a "solid waste". This concession completely undercuts respondent's arguments. In the context of a manufacturing or processing cycle, waste is something that is of no further use in the manufacturing or processing cycle. Waste would either be disposed of as garbage or "recycled". Thus, respondent's concession takes animal bone out of the traditional processing cycle in the meat fabrication business. Any further use of the bones would be "recycling" of solid waste and the equipment so used would fall within the explicit statutory definition of "recycling equipment".

KÖRNER and SWIFT, *JJ.*, agree with this concurring opinion.

---

HALPERN, *J.*, dissenting. Respectfully, I must dissent. By focusing on whether Congress drew a seemingly arbitrary distinction between animal waste and other solid waste, and virtually ignoring the question of what constitutes recycling, the majority, in my opinion, has missed the boat.

Section 48(l)(6) implicitly distinguishes two types of recycling: (1) Recycling that serves to recover usable raw materials, sec. 48(l)(6)(A), and (2) recycling that converts waste into fuel or other useful forms of energy, sec. 48(l)(6)(D). That distinction, which is explicitly drawn by section 1.48-9(g), Income Tax Regs., is neither challenged by petitioner nor questioned by the majority opinion. Section 1.48-9(g), Income Tax Regs., provides in pertinent part:

> (g) Recycling equipment—(1) In general. *Recycling equipment is equipment used* exclusively to sort and prepare, or recycle, solid waste (other than animal waste) *to recover usable raw materials* ("recovery equipment"), *or to convert solid waste* (including animal waste) *into fuel or other useful forms of energy* ("conversion equipment"). * * * [Emphasis added.]

The distinction between "recovery equipment" and "conversion equipment" can also be stated as a distinction between "recovery recycling" and "conversion recycling". Simply put, those are distinct processes: one yields raw materials; the other produces energy. Accordingly, it should be no surprise if certain types of waste are usable for conversion recycling but not for recovery recycling. The starting point must be to define what I have termed recovery recycling. Respondent's arguably narrow definition of recovery recycling limits such process to one in which the raw materials recovered can be reused to produce an end-product that is the same as (or perhaps similar to) the end product that gave rise to the solid waste (the majority describes that limitation as imposing an "end-product requirement"). Under respondent's view, animal waste, inherently incapable of being used to create a new animal, or at least additional hamburger or pork chops, simply is not susceptible to recovery recycling. Nonetheless, animal waste can be used to create fuel or other useful energy and, therefore, is susceptible to conversion recycling. The "dispa-

rate treatment" stems from the distinct nature of the two processes, assuming respondent's definition of recovery recycling.

The majority, however, argues that solid waste should be treated the same in both contexts:

> The regulations, however, differentiate between the two references to the term "solid waste". Section 1.48-9(g)(1), Income Tax Regs., excludes animal waste from the definition of recycling of solid waste for purpose of recycling. By way of a similar parenthetical, the same section of the regulation specifically includes animal waste in the definition of solid waste for purposes of the conversion of solid waste into fuel or other useful forms of energy. No explanation is offered by respondent for this disparate treatment between the Code and regulation nor is any to be found. [Majority op. p. 134.]

In my opinion, the majority misunderstands the meaning of section 1.48-9(g), Income Tax Regs. The regulation does not, as the majority suggests, contain contradictory definitions of solid waste, in one instance defining solid waste to include animal waste and in another instance defining solid waste to exclude it. The regulation merely provides that only solid waste *other than* animal waste is eligible for recovery recycling.[1] The parenthetical exclusion of animal waste in section 1.48-9(g), Income Tax Regs., may well be nothing more than the regulation's poor way of expressing, by one example, respondent's narrow definition of recovery recycling. If that is so, then the real issue here is not the definition of solid waste but the definition of recovery recycling. Accordingly, to justify a holding for petitioner, it is insufficient to determine, as the majority does and respondent concedes, that animal waste constitutes solid waste. To hold for petitioner, it is also necessary to consider whether animal waste can be subject to recovery recycling.

Thus, we must determine whether respondent's definition of the term "recovery recycling" is reasonable or is plainly inconsistent with the Code. See *Bingler v. Johnson,* 394 U.S. 741, 750 (1969). Moreover, as the majority states, that determination must be made with an especially high degree of

---

[1]Just as the phrase "colors other than blue" does not suggest that blue is not a color, the phrase "solid waste other than animal waste" does not suggest that animal waste is not solid waste. To reduce respondent's argument to the defense of an inconsistent definition of the term "solid waste" is to construct a straw dummy and ignore the real issue in this case.

deference, since we deal here with a legislative regulation. *Phillips Petroleum Co. v. Commissioner,* 97 T.C. 30, 34 (1991).

Inexplicably, the majority casts deference aside, conclusorily asserting that "any reasonable reading of the statutory provisions dealing with 'recycling equipment,' in light of the natural import of the word 'recycle' and the legislative history, supports petitioner's substantive position herein." Majority op. p. 132. The majority seems content to observe that: "No mention is made in the Code, regulations, or legislative history of a same type or similar end-product requirement." However, the majority concedes that "the legislative history sets forth end-product examples of metal waste, textile fibers, and paper products." Majority op. p. 132. Moreover, the majority fails to cite even one example from the legislative history of a non-end-product example. Thus, while the legislative history lacks any explicit statement that there is an end-product requirement, it equally lacks any explicit statement that there is not. Further, the fact that, with respect to recovery recycling, the legislative history lists end-product examples *only* is clearly sufficient to support a reasonable inference that Congress intended an end-product requirement. While I might not read in such a requirement if called upon to determine the *most likely* interpretation, our task is far more humble. All we may determine is whether the Commissioner's definition is reasonable or is plainly inconsistent with Congress' intent. See *Bingler v. Johnson, supra.* I believe that petitioner has failed to sustain the heavy burden of demonstrating the latter.

PARKER, *J.,* agrees with this dissent.