**GRIFFIN INDUSTRIES, INC.,**
**a Kentucky corporation**

v.

**The UNITED STATES.**

**No. 622–83T.**

United States Court of Federal Claims.

Dec. 1, 1992.

---

184

David J. Hooker, Cleveland, Ohio, attorney of record for plaintiff.

Ellen C. Specker, Washington, D.C., with whom was Acting Asst. Atty. Gen. James A. Bruton, for defendant.

OPINION

YOCK, Judge.

The plaintiff in this action seeks the recovery of income taxes and interest paid to the Government for the calendar years 1978 and 1979. The plaintiff alleges that it is entitled to a 10 percent business energy investment credit on certain rendering recovery equipment as provided for by sections 38 and 46 of the Internal Revenue Code. Trial was held on October 24, 1991, in Cincinnati, Ohio, to determine the validity and application of Treas.Reg. § 1.48–9(g) (1981), the regulatory section upon which the plaintiff's entitlement to the credit hinges.

Upon full consideration of the entire record, this Court concludes that the drafters of the Internal Revenue Code intended that equipment used to render animal parts qualifies for the energy investment tax credit. Therefore, that portion of Treas.Reg. § 1.48–9(g)(1) (1981) excepting animal waste from the definition of qualifying source material in the case of recovery equipment (but not conversion equipment) is void as inconsistent with that congressional intent.

*Factual Background*

The plaintiff, Griffin Industries, Inc. (Griffin), is the parent corporation of a group of affiliated subsidiary corporations. These subsidiaries are engaged in the rendering business; a business which converts the animal waste[1] of slaughterhouses, packing plants, poultry processing plants, butcher shops, restaurants, and supermarkets, along with kitchen grease[2] and livestock carcasses,[3] into rendered animal fat, sometimes referred to as rendered tallow, and various types of animal meal. The rendered tallow produced by the plaintiff is inedible for humans, but is used in animal feed and pet food, and is sold to chemical, cosmetic, and soap companies for use in the manufacturing of such products as lipstick, candles, and soap. The animal meal produced by the plaintiff is a finely ground particle mixture, which is added to animal feed as a source of protein, trace minerals, and other nutrients. The rendering process consists of heating or cooking the material, to melt the fat and condition the animal fibrous tissue, and then separating the fat and the protein. During the two taxable years here in issue, the plaintiff employed two types of machines to perform this process: individual batch cookers and several types of continuous rendering systems.

A standard batch cooker is an individual unit consisting of a horizontal steam jacketed cylindrical vessel equipped with an agitator. The standard batch cooker measures five feet by twelve feet in diameter, has a heating surface of 210 to 220 square feet, and is driven by a 50 horsepower motor. When the material arrives at the rendering plant, it is dumped into a receiving bin and conveyed to a crusher for size reduction and is then loaded into the individual batch cookers and heated for one and one-half to four hours, depending upon the material being processed, at temperatures ranging from 250 degrees to 275 degrees (F). After cooking, the material is unloaded into a drain pan to allow the free flowing fat to separate from the solid protein. The material is then conveyed to a press to complete the separation of fat and protein. The fat discharged from the press normally contains fine solid particles that are removed by centrifuge or filtration, leaving tallow as the product. The solid protein material discharged from the press, known as unground meal, is screened and

---

1. The "waste" here referred to consists of the fat, bone, feathers, meat scraps, animal organs and offal produced as a result of processing beef, pork, and poultry. The "waste" here involved does not include animal excrement. It should also be noted here that liquid is drained from this waste at three separate stages: before the waste is picked up by the plaintiff, while the waste is being transported from the pick-up point to the plaintiff's rendering plant, and while the waste is in the receiving bins at the plaintiff's rendering facility.

2. At normal room temperatures, kitchen grease is a solid.

3. These three elements—waste, grease and carcasses—will collectively be referred to as "material." Nothing is added to this material by the plaintiff.

ground with a hammer mill to produce animal meal.

The newer, continuous rendering system, by contrast, consists of a single, large, horizontal, steam-jacketed, cylindrical vessel equipped either with a rotating shaft to which paddles are attached that lift and move the material horizontally through the cooker, as in the case of the Duke 1800 Equa Cooker, or with a rotating shaft to which are mounted a series of steam heated hollow discs, as in the case of the Stord Bartz TS 100 or 60. The continuous system processes material in generally the same way as the individual batch cookers, except that in the continuous system the material is continuously loaded and unloaded at a constant rate, saving the plaintiff time, manpower, and energy.

Throughout all of 1978 and 1979, the plaintiff operated rendering plants in Newberry and Columbus, Ohio, and Jackson, Mississippi. For the last five months of 1979, the plaintiff also operated a rendering plant in Hampton, Florida. At the beginning of 1978, each of these plants operated varying numbers of batch cookers only. At some point during either 1978 or 1979, however, the plaintiff constructed at each of these plants some type of a new continuous rendering system. Specifically, the rendering equipment at these four plants, for the two years in question, consisted of the following: at the Newberry plant, by the end of December 1978, a Stord Bartz TS 100 Continuous System, driven by a 125 horsepower motor, with a heating surface of approximately 4,300 square feet, plus six standard batch cookers; at the plaintiff's Columbus plant, by the end of June 1979, a Stord Bartz TS 60 Continuous System driven by a 75 horsepower motor, with a heating surface of approximately 2,153 square feet, plus four standard batch cookers; at the Jackson plant, by the end of September 1979, a Stord Bartz TS 100 Continuous System driven by a 125 horsepower motor, with a heating surface of approximately 4,300 square feet, plus six standard batch cook-

ers; and at the Hampton plant, by the end of 1979, a Duke 1800 Equa Cooker Continuous System, driven by a 125 horsepower motor, plus four standard batch cookers.

After the new, continuous rendering equipment was in place, Griffin used the batch cookers for excess capacity at the plants, periodic testing of solid waste, isolation of very poor quality solid waste, and as backup capacity in the event of mechanical breakdown of the plant's new continuous system. A comparison of the horsepower to heating surface ratio between the batch cookers and any of the continuous rendering systems shows one benefit of the continuous systems to be the consumption of less electricity to process the same amount of material. Besides this electrical cost savings, however, Griffin also viewed the installation of these new continuous rendering systems as a potential tax savings.

Section 38 of the Internal Revenue Code [4] (I.R.C.) provides for credit against tax to the extent allowed by I.R.C. § 46 (1976). Section 301(a) of the Energy Tax Act of 1978, Pub.L. No. 95–618, 92 Stat. 3174, amended I.R.C. § 46 to include a 10 percent business energy credit for investment in qualifying types of "energy property" between October 1, 1978, and December 31, 1982. I.R.C. § 46(a)(2)(C) (1978) prior to amendment by section 221(a), Crude Oil Windfall Profit Tax Act of 1980, Pub.L. No. 96–223, 94 Stat. 229. I.R.C. § 48($l$)(2)(A) (Supp. II 1978) delineates six types of energy property entitled to this business investment credit, of which one qualifying category is "recycling equipment." I.R.C. § 48($l$)(6)(A) (1978) defines recycling equipment as:

[A]ny equipment which is used exclusively—

(i) to sort and prepare solid waste for recycling, or

(ii) in the recycling of solid waste.

On September 19, 1980, The Internal Revenue Service (IRS) published a notice of

4. Unless otherwise indicated, all references are to the Internal Revenue Code of 1954, as amended.

proposed rulemaking in the Federal Register as further elaboration upon what type of equipment would be qualified recycling equipment. The public was invited to comment upon the following proposed definition of recycling equipment:

(g) *Recycling equipment*—(1) *In general.* Recycling equipment is equipment used exclusively to sort and prepare, or recycle, solid waste to recover usable raw materials ("recovery equipment"), or to convert solid waste into fuel or other forms of energy ("conversion equipment"). Recycling equipment may include certain other onsite related equipment.

(2) *Recovery equipment.* Recovery equipment includes equipment that—

(i) separates solid waste from a mixture of waste,

(ii) applies a thermal, mechanical, or chemical treatment to solid waste to ensure the waste will properly respond to recycling, or

(iii) recycles solid waste to recover usable raw materials, but not beyond occurrence of the first of the following:

(A) The point at which a material has been created that can be used in beginning the fabrication of an end-product in the same way as materials from a virgin substance. Examples are the fiber stage in textile recycling, the newsprint or paperboard stage in paper recycling, and the ingot stage for other metals (other than iron and steel). * * *

(B) The point at which the material is a marketable product (*i.e.*, has a value other than for recycling) even if the material is not marketed by the taxpayer at that point.

* * * *

(5) *Solid waste.* (i) The term "solid waste" has the same meaning as in § 1.103–8(f)(2)(ii)(*b*), subject to the following exceptions and the other rules of this subparagraph (5):

(A) The date the equipment is placed in service is substituted in the first sentence of § 1.103–8(f)(2)(ii)(*b*) for the date of issue of the obligations, and

(B) Material that has a market value at the place it is located only by reason of its value for recycling is not considered to have a market value.

(ii) Solid waste may include a nominal amount of virgin materials, liquids, or gases, not to exceed 10 percent. If more than 10 percent of the material recycled during the course of any taxable year (including the "start up" year) consists of virgin material, liquids or gases, the equipment ceases to be energy property and is subject to recapture under section 47. The determination of the portion of virgin material, liquids or gases used is based on volume, weight, or Btu's, whichever is appropriate.

Proposed Treas.Reg. § 1.48–9(g), 45 Fed. Reg. 62,496, 62,505 (1980). The IRS held a public hearing on this proposed regulation on December 4, 1980.

Final Treas.Reg. § 1.48–9(g) was published in the Federal Register, 46 Fed.Reg. 7287, 7296 on January 23, 1981. The regulation read, in pertinent part, as follows:

(g) *Recycling equipment*—(1) *In general.* Recycling equipment is equipment used exclusively to sort and prepare, or recycle, solid waste (other than animal waste) to recover usable raw materials ("recovery equipment"), or to convert solid waste (including animal waste) into fuel or other useful forms of energy ("conversion equipment").

The final regulation is otherwise substantially identical to the proposed regulation. "In response to a request for clarification, the final rules specify that equipment that processes animal waste is not recycling equipment." 46 Fed.Reg. 7287, 7290 (1981). The source of this request, or the exact time it was made, is unknown.

For the calendar years ending December 31, 1978, and December 31, 1979, the plaintiff filed consolidated federal income tax returns, Form 1120, for its affiliated corporate group with the IRS claiming, among other things, a deduction based upon the aforementioned business energy investment credit. The amount claimed in 1978 was $65,666, alleged by the plaintiff to be 10 percent of the purchase price of the

rendering equipment that the plaintiff placed in service after September 30, 1978, and $310,921 in 1979, also alleged by the plaintiff to be 10 percent of the purchase price of the rendering equipment the plaintiff placed in service during that tax year. On November 24, 1980, between the issuance of the proposed and final regulation, Griffin sought technical advice from the IRS as to its eligibility for the business energy investment credit it had claimed on its newly installed continuous rendering systems. Following the publication of the final regulation, and relying upon the animal waste exclusion included in the final regulation as it pertained to "recovery equipment," the IRS concluded that the plaintiff did not qualify for the credit. Priv.Ltr.Rul. 81–38–016 (June 18, 1981).

The IRS assessed a deficiency in taxes against the plaintiff on May 3, 1983, for the tax year 1978 in the amount of $124,420.00 plus $69,453.41 in interest and $330,518.00 plus $163,739.78 in interest for the tax year 1979. Among other things, the business energy investment credit Griffin claimed for each of these years was disallowed. Griffin paid the entire deficiency assessed against it for both years, including that portion dealing with the business energy investment credit, with interest. On June 16, 1983, the plaintiff filed amended U.S. Corporation Income Tax Returns, Form 1120X, claiming a refund for the entire deficiency. The IRS notified the plaintiff of the disallowance of its entire refund claim on August 8, 1983. Suit was filed in this Court on October 11, 1983. The present dispute centers only upon the IRS' disallowance of Griffin's business energy investment credit for 1978 and 1979.[5]

### Discussion

In this dispute, the plaintiff makes several arguments in support of its position that it is entitled to a business energy investment credit for the purchase and installation of its new continuous rendering equipment. First, Griffin contends that the material it processes is solid animal waste (excluding animal excrement), which con-

tains no more than 10 percent free flowing liquid, or other virgin material. Second, Griffin contends that the recovery equipment that processes this material has increased Griffin's recycling capacity and is used exclusively to recycle solid waste. The material is allegedly not recycled, however, beyond the point of when either a marketable product has been recovered or a material has been created that can be used in beginning the fabrication of an end product in the same way as materials from a virgin substance. Third, Griffin further argues that the animal waste exception of final Treas.Reg. § 1.48–9(g)(1) (1981) is invalid, either because the notice requirements of the Administrative Procedure Act (APA) were not met or because the exception is contrary to the legislative history of the Energy Tax Act of 1978. In the alternative, Griffin contends that the term "animal waste" in final Treas.Reg. § 1.48–9(g)(1) is inapplicable because it refers to a substance (excrement) different from that which Griffin processes. Griffin consequently contends that, having met the factual requirements of final Treas.Reg. § 1.48–9(g), the animal waste exception allegedly being invalid or inapplicable, it is entitled to the business energy investment credit.

In contrast to the plaintiff's position, the Government asserts the following arguments. First, rendering does not constitute recycling as that term is used in I.R.C. § 48(l)(6)(A) (1978). Second, the plaintiff does not meet all the other statutory and regulatory requirements for the investment credit for recycling equipment. Third, Treas.Reg. § 1.48–9(g)(1) (1981) is a validly promulgated legislative regulation. Fourth, Treas.Reg. § 1.48–9(g)(1) did not use the term "animal waste" to refer only to animal excrement.

A number of factual determinations must be made in order to settle this dispute. The Court must first determine whether the plaintiff's rendering recovery equipment would qualify for the investment tax credit in the absence of the restrictive parenthetical excluding animal

---

**5.** All other issues (deductions, etc.) have been settled.

waste from solid waste in the definition of recovery equipment in final Treas.Reg. § 1.48–9(g)(1). If plaintiff does satisfy all of the other statutory and regulatory requirements, this Court must then determine the validity of the exclusion of animal waste in Treas.Reg. § 1.48–9(g)(1); specifically whether the requirements of the APA were met when it was promulgated, and if they were, whether that portion of the regulation might still be invalid as contrary to congressional intent. If the exclusion is valid, the Court must then determine whether the regulation in question was properly applied to the plaintiff.

### A. Requirements for an Investment Credit for Recycling Equipment Under the Energy Tax Act of 1978

#### 1. Does rendering constitute recycling?

In order to qualify for an energy investment tax credit, plaintiff's rendering equipment must qualify as "recycling equipment" under I.R.C. § 48(l)(6)(A) (1978). The first inquiry, then, is whether rendering constitutes recycling.

Plaintiff argues that the ordinary and plain meaning of "recycle" includes the rendering of animal parts. In support of its argument, Griffin refers to the definition of the term found in the Random House Dictionary of the English Language, which defines recycling as follows:

[T]o treat or process (used or waste materials) so as to make suitable for reuse: *recycling paper to save trees.*

Random House Dictionary of the English Language, unabridged (2d ed. 1987) (emphasis in original). Griffin argues that rendering fits this definition because it involves the processing of waste materials to make them suitable for reuse.

The Government, on the other hand, argues that Griffin does not qualify for the investment tax credit because the rendering conducted by Griffin does not constitute recycling as that term is used in I.R.C. § 48(l)(6)(A). According to the Government, recycling contains two attributes that are lacking in Griffin's rendering operation: (1) the processing of a material that would otherwise be discarded, and (2) the creation of an end product that is useable in the same manner as the original use of the material being processed. The Court will consider the Government's arguments separately.

■ To begin with, there is no requirement in the statute or the regulations that the material recycled must be that which would otherwise be discarded. It is true, as the Government points out, that the four examples of qualifying resource recovery activities that Congress mentioned in the legislative history—paper recycling, glass recycling, metal recycling, and textile recycling—all involve the processing of a material that would otherwise be discarded. *See* S.Rep. No. 95–529, 95th Cong., 2d Sess., 82 (1977) *reprinted in* 1978 U.S.C.C.A.N. 7942, 8014–15; H.R.Rep. No. 95–496, 95th Cong., 2d Sess., Part III, 122 (1977), *reprinted in* 1978 U.S.C.C.A.N. 8304, 8410–11. This fact alone, however, is insufficient to support a conclusion that in *all* instances, recycling must involve the processing of a material that would otherwise be discarded. However, even if this Court were to assume that such a requirement existed, the plaintiff would meet it. At trial, Griffin introduced evidence that the animal parts and grease that it collects are considered garbage by the slaughterhouses, packing plants, and restaurants that generate them and have no value other than their value to a renderer. Griffin offered testimony that these products would have to be disposed of if they were not retrieved and processed. The Government attempts to rebut this evidence by pointing out that long before the advent of the modern rendering industry, animal parts were used to make such things as soap, hair dye, awls, and candles. This is an interesting historical observation, but it does not refute Griffin's showing that today, in the absence of rendering, the restaurant grease and animal parts would simply be thrown away.

The Government also contends that in order for a process to be characterized as recycling, the end product recovered must be one that is useable in the same manner as the original use of the material pro-

cessed. In support of its argument, the Government refers again to the legislative history where Congress listed by way of example four resource recovery activities that would qualify for the investment tax credit: paper recycling, glass recycling, metal recycling, and textile recycling. S.Rep. No. 95–529, 95th Cong., 2d Sess., 82 (1977), *reprinted in* 1978 U.S.C.C.A.N. 7942, 8014–15; H.R.Rep. No. 95–496, 95th Cong., 2d Sess., Part III, 122 (1977), *reprinted in* 1978 U.S.C.C.A.N. 8304, 8410–11. The Government argues that in each of those four examples, the discarded material is recycled into newly created products of the same type; that is, discarded metal, glass, textile, or paper products are recycled to create more metal, glass, textile or paper products. Thus, the Government argues that rendering is not recycling because the animal parts that are rendered are not turned back into animals.

This Court disagrees with the Government's interpretation of the legislative history. The United States Tax Court considered the same argument in a recent case involving another renderer who processed animal bones to produce gelatin bone, which was then sold to the photographic industry as raw material for use as a coating on film. *See Pepcol Mfg. Co. v. Commissioner,* 98 T.C. 127 (1992). In an *en banc* decision, the Tax Court explained,

> No mention is made in the Code, regulations, or legislative history of a same type or similar end-product requirement. To be sure, the legislative history sets forth end-product examples of metal waste, textile fibers, and paper products as reflected in TAM 8138016 * * * but there is not the slightest indication in such history of an end-product requirement. [Citation omitted.] Section 48(1)(6)(B)(i) provides that any equipment used after the first marketable product is produced will fail to be recycling equipment. There is no provision that also requires the first marketable product produced by the recycling process to be the same as the solid waste.

*Pepcol,* 98 T.C. at 132.

■ This Court is persuaded by the compelling reasoning of the Tax Court in *Pep-*

col. There is simply no indication that Congress meant to impose a similar end-product requirement, and if Congress wanted to impose one, it could have easily done so explicitly. Moreover, the common usage of the word "recycling" envisions a process whereby items that have no other economic use in their present form are transformed into valuable, useable products. It makes no difference whether paper is recycled to create more paper or whether disposable diapers are recycled to create plastic chairs—both processes constitute "recycling." Similarly, it makes no difference whether the animal parts and grease rendered by Griffin are used to create more animals or are used to create such items as candles, lipstick, and animal feed. Either way, waste products have been used to create valuable, useful products. This Court rejects as artificial the Government's attempt to narrow the definition of "recycle" to exclude processes that do not result in a similar end product.

2. Are the animal parts rendered by the plaintiff "solid waste?"

In order to qualify for an investment tax credit, I.R.C. § 48 requires that a taxpayer's recycling equipment be used exclusively to sort and prepare solid waste for recycling or in the recycling of solid waste. I.R.C. § 48(*l*)(6)(A) (1978). The parties have stipulated that Griffin processes exclusively fat, grease, bone, feathers, meat scraps, animal organs, and offal, and that nothing is added to the material during processing. Thus, this Court must decide whether the material that Griffin processes falls under the definition of "solid waste" for the purposes of I.R.C. § 48.

Unfortunately, I.R.C. § 48 does not define "solid waste," and the search for a suitable definition requires a journey through a number of regulations and statutes. The starting point is Treas.Reg. § 1.48–9(g)(5)(i) (1981). This regulation provides that the term "solid waste" is to have the same meaning as in Treas.Reg. § 1.103–8(f)(2)(ii)(b) (1972), subject to exceptions that are not relevant to this case, and subject also to the 10 percent rule, which

will be discussed below. Treas.Reg. § 1.103–8(f)(2)(ii)(b), in turn, provides that the term "solid waste" is to have the same meaning as in section 203(4) of the Solid Waste Disposal Act (42 U.S.C. § 3252(4) (1970)). Section 203(4) of the Solid Waste Disposal Act reads as follows:

> (4) The term "solid waste" means garbage, refuse, and other discarded solid materials, including solid-waste materials resulting from industrial, commercial, and agricultural operations, and from community activities, but does not include solids or dissolved material in domestic sewage or other significant pollutants in water resources, such as silt, dissolved or suspended solids in industrial waste water effluents, dissolved materials in irrigation return flows or other common water pollutants.

For the purposes of I.R.C. § 48, however, the definition of "solid waste" is also subject to the 10 percent rule in Treas.Reg. § 1.48–9(g)(5)(ii), which provides as follows:

> Solid waste may include a nominal amount of virgin materials, liquids, or gases, not to exceed 10 percent. If more than 10 percent of the material recycled during the course of any taxable year (including the "start up" year) consists of virgin material, liquids, or gases, the equipment ceases to be energy property and is subject to recapture under section 47.

In the final analysis, the definition of "solid waste" is the same as the definition found in section 203(4) of the Solid Waste Disposal Act, subject to the limitation in Treas. Reg. § 1.48–9(g)(5)(ii) that the material not include more than 10 percent liquid.

The plaintiff contends that the animal parts and kitchen grease it processes meet the definition of "solid waste." In support of its argument, Griffin cites the legislative history of the Solid Waste Disposal Act, which indicates that Congress intended the term "solid waste" to include waste from slaughterhouses. The relevant portion of the legislative history appears below:

> Solid waste collection and disposal activities create one of the most serious and most neglected aspects of environmental contamination affecting public health and welfare. Solid wastes include a great variety of things that individuals, manufacturers, commercial establishments, and communities discard as no longer usable, such as garbage, rubbish, ashes, street refuse, demolition debris, construction refuse, abandoned automobile hulks, old refrigerators and furniture, and the *wastes from slaughterhouses*, canneries, manufacturing plants, and hospitals.

H.R.Rep. No. 899, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 3608, 3614 (emphasis supplied).

At trial, Griffin introduced into evidence several samples of the material it renders, including restaurant grease and various poultry, pork, and beef parts. Mr. Dennis Griffin, the President of Griffin Industries, Inc., testified that all of the material is solid when it is collected by the plaintiff, and that the restaurant grease remains in a solid state until it reaches a temperature of around 85 to 90 degrees (F). Mr. Griffin explained that the excess blood and water from the slaughterhouse waste is drained three times before it begins the rendering process: once at the slaughterhouse before it is collected by Griffin, again on the perforated floors of Griffin's collection trucks on the way to the plant, and once more in Griffin's receiving bins at the actual plant site.

The Government does not attempt to refute Griffin's evidence that the material it processes is solid waste by the time it enters the rendering process. Instead, the Government argues that the waste material must be solid at the time it is dumped into the receiving bin at Griffin's plant site, even if the equipment for which the investment tax credit is claimed is recycling equipment rather than sorting and preparation equipment. In support of this contention, the Government refers to Treas.Reg. § 1.48–9(g)(4) (1981), which provides the following:

> (4) *On-site related equipment.* Recycling equipment also includes onsite loading and transportation equipment, such as conveyors, integrally related to other

recycling equipment. This equipment may include *equipment to load solid waste into a sorting or preparation machine* and also a conveyor belt system that transports solid waste from preparation equipment to other equipment in the recycling process. [Emphasis added.]

The Government insists that Griffin has failed to establish that the material it processes is less than 10 percent liquid *at the time it enters the receiving bins.* In an apparent attempt to rebut any such assertion by Griffin, the Government points to an EPA report which states that 20 percent of the material processed at another rendering plant was blood and excess water. The Government reasons, "[i]t is likely that the percentage of fluids in the animal parts that plaintiff rendered was just as high." Trial Brief for the United States, filed Jan. 21, 1992, at 13.

■ This Court, however, believes that the Government's reliance on Treas.Reg. § 1.48–9(g)(4) in this regard is misplaced. The Government is asking this Court to conclude that Treas.Reg. § 1.48–9(g)(4) requires that the waste processed by Griffin be solid at the time it is loaded into a receiving bin in order for the rendering equipment that ultimately processes the waste to qualify for the tax credit. This Court is not prepared to make that leap in logic. Once again, the Government is reading into the regulation something that is not there. Treas.Reg. § 1.48–9(g)(4) merely elaborates upon the types of onsite equipment that may be eligible for the investment tax credit; it in no way establishes the point in time at which the waste must be solid. Indeed, by clarifying that the term "recycling equipment" is not just reserved for the equipment ultimately used to process the waste, but instead may include onsite loading equipment and transportation equipment, the thrust of Treas. Reg. § 1.48–9(g)(4) is to *increase* the instances in which a taxpayer might be able to claim an investment tax credit.

The Court is also puzzled by the Government's reliance on an EPA report stating that 20 percent of the material processed by another unrelated rendering plant constituted blood and excess water. Presumably, the Government would like this Court to conclude that therefore the material processed by Griffin was also 20 percent liquid. The fact that the material processed by another rendering plant might consist of 20 percent liquid does not mean that the material that Griffin processed was 20 percent liquid. Such an unsupported assertion is insufficient to rebut Griffin's evidence that the waste it processed was solid. This Court is persuaded, by the evidence presented, that the material rendered by Griffin constituted "solid waste" for purposes of Treas.Reg. § 1.48–9(g). Simply put, Griffin has produced credible testimony and demonstrative evidence to show that the material was solid waste, and the Government has produced no evidence to effectively refute that showing.

3. Does plaintiff meet the other statutory and regulatory requirements for the investment tax credit?

In addition to proving that rendering is recycling and that the material it processes is solid waste, Griffin must also demonstrate that it meets the other statutory and regulatory requirements in order to qualify for an investment tax credit. For instance, I.R.C. § 48(*l*)(6)(A) (1978) provides that recycling equipment is any equipment *used exclusively* to recycle solid waste. I.R.C. § 48(*l*)(6)(C) elaborates upon this requirement:

(C) 10 PERCENT VIRGIN MATERIAL ALLOWED.—Any equipment used in the recycling of material which includes some virgin materials shall not be treated as failing to meet the exclusive use requirements of subparagraph (A) if the amount of such virgin materials is 10 percent or less.

Both parties have stipulated that nothing is added to the material rendered by Griffin. In addition, Griffin produced credible testimony at trial to establish that the continuous processors are used for no other purpose than to recycle solid waste. The Government has offered no evidence to dispute these points. Therefore, this Court finds that Griffin's continuous system equipment is used exclusively to recycle solid waste in

accordance with I.R.C. § 48(*l*)(6)(A) and (C) (1978).

 Further, Treas.Reg. § 1.48–9(g)(1) (1981) requires that the recycling equipment be used to recycle solid waste "to recover usable raw materials." Griffin produced testimony at trial to establish that the tallow produced by Griffin is a raw material used by the animal feed, chemical, cosmetic, and household products industries and that the animal meal produced by Griffin is a raw material used by the animal feed industry. In addition, the parties stipulated that the rendered tallow produced by Griffin is used for animal feed and pet food and is sold to chemical, cosmetic, and soap companies for use as a raw material. Therefore, this Court also finds that Griffin's continuous processors are used to recover usable raw materials in accordance with Treas.Reg. § 1.48–9(g)(1).

Finally, I.R.C. § 48(*l*)(6)(B)(i) provides that no investment tax credit will be available for "any equipment used in a process after the first marketable product is produced * * *." The regulation explains that recycling equipment does not include any equipment used beyond the occurrence of the first of the following: (1) the point at which a material has been recovered that can be used in beginning the fabrication of an end product in the same way as materials from a virgin substance, or (2) the point at which a material is a marketable product. Treas.Reg. § 1.48–9(g)(2)(iii) (1981). At trial, Mr. Griffin testified that the plaintiff's rendering equipment does not process animal parts or grease beyond the point at which the material is a marketable product. In addition, Mr. Griffin testified that the animal meal and tallow rendered by Griffin are used as ingredients in animal feed by the animal feed industry and as raw stock by the soap and chemical industries. Again, the Government apparently does not dispute this point. Therefore, this Court finds that plaintiff's continuous processors do not process solid waste beyond the point at which the material is a marketable product or beyond the point at which the material may be used in fabricating an end product.

## B. The Validity of Treas.Reg. § 1.48–9(g)(1) (1981)

Thus far, plaintiff has succeeded in demonstrating that if it were not for the parenthetical in Treas.Reg. § 1.48–9(g)(1) excluding animal waste from solid waste in the definition of recovery recycling equipment, plaintiff would qualify for an investment tax credit for the continuous processors it purchased in 1978 and 1979. This brings us to the final hurdle of the race. At this time, the Court must determine the validity of the first parenthetical excluding animal waste in Treas.Reg. § 1.48–9(g)(1). Specifically, the Court must decide whether the regulation was properly promulgated in accordance with the strictures of the APA. If the regulation was properly promulgated, the Court must then determine whether the language in the regulation excepting animal waste from solid waste in the definition of recycling equipment is inconsistent with the Energy Tax Act of 1978.

### 1. Was the regulation properly promulgated?

 The plaintiff alleges that parts of the APA have been violated. These sections state:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

\* \* \* \* \* \*

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presenta-

tion. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. * * *

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date * * *.

5 U.S.C. §§ 553(b), (c), and (d) (1988). This Court's predecessor, the United States Court of Claims, has observed that the purpose of the above-quoted provisions is "to give affected members of the public an opportunity to comment." *American Standard Inc. v. United States,* 220 Ct.Cl. 411, 427, 602 F.2d 256, 267 (1979), *later proceeding,* 650 F.2d 286, 223 Ct.Cl. 794 (1980). Because the opportunity to comment was absent, the Court in *American Standard* invalidated a Treasury regulation dealing with the calculation of tax owed by affiliated companies filing a consolidated tax return.

In support of its argument that Griffin's opportunity to comment on proposed Treas. Reg. § 1.48–9(g) was similarly absent, and that this Court should consequently reach the same conclusion as the Court in *American Standard,* the plaintiff relies principally upon *AFL–CIO v. Donovan,* 757 F.2d 330 (D.C.Cir.1985), and the standard articulated therein. In that case, the District of Columbia Circuit invalidated one of eight challenged regulations promulgated by the Secretary of Labor, implementing the Service Contract Act of 1965, 41 U.S.C. §§ 351–358 (1982) (as amended), as violative of the notice and comment requirements of the APA. The Court stated:

It is, of course, elementary that a final rule need not be identical to the original proposed rule. "The whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different—and improved—from the rules originally proposed by the agency." *Trans–Pacific Freight Conference v. Federal Maritime Commission,* 650 F.2d 1235, 1249 (D.C.Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 * * * (1981). However, "[w]here the change between the pro-

posed and final rule is important, the question for the court is whether the final rule is a 'logical outgrowth' of the rulemaking proceeding." *United Steelworkers v. Marshall,* 647 F.2d 1189, 1221 (D.C.Cir.1980), *cert. denied sub nom., Lead Industries Ass'n, Inc. v. Donovan,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 * * * (1981). "[I]f the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal." *Small Refiner Lead Phase– Down Task Force v. United States Environmental Protection Agency,* 705 F.2d 506, 547 (D.C.Cir.1983).

*Donovan,* 757 F.2d at 338 (footnotes omitted). Because one of the eight regulations challenged was not the logical outgrowth of the proposed regulation, the final regulation was held invalid. It is Griffin's contention that because the animal waste exception was in the final regulation, and not in the proposed one, and also because the source of the proposal that animal waste be excepted is unknown, the exception is invalid as having violated Griffin's opportunity to comment. The Court, however, rejects these contentions because Griffin had notice of the regulation's subject and also because the change found in the final regulation was a logical outgrowth of the proposed regulation.

In *Donovan,* the Court found that no notice of the regulatory change had been given to the public by the Secretary of Labor and no logical outgrowth could, therefore, exist between the proposed and final regulation. Although the one regulation ultimately held invalid in that case was published in the Federal Register, the Court concluded on the facts of that case that the challenged regulation was published in the notice of proposed rule making simply to place other regulations, ones specifically cited for change, into the context of the entire regulation. Consequently, the plaintiffs were found to have had no notice of the ultimate change later found in the final regulation and thus no opportunity to comment. No such similar situation exists here. The Federal Register, 45 Fed.Reg.

62,496, 62,500 (1980), contained a thorough discussion of the proposed regulation defining qualifying recycling equipment. Nor was proposed Treas.Reg. § 1.48–9(g) published simply to flesh out another section or subsection of the IRS' regulations. It was rather a substantive proposal, discussed sufficiently to apprise the public that the matter was open for comment.

Griffin's allegations are seemingly premised upon the notion that the IRS, having published the proposed regulation without the animal waste exclusion, may not then include such an exclusion without first giving the plaintiff another opportunity to comment. This notion is faulty. Once having been apprised of the fact that the types of equipment which would qualify for a business energy investment credit were being discussed, Griffin had its opportunity to comment. "The publication of a *proposed* rule does not forever bind the agency to the approach contained in the NPR; if interested parties favor a particular regulatory proposal, they should intervene in the rulemaking to support the approach an agency has tentatively advanced." *American Medical Ass'n v. United States*, 887 F.2d 760, 769 (7th Cir.1989). *See also Association of Am. R.R. v. Adams*, 485 F.Supp. 1077, 1085 (D.D.C.1978) (plaintiff railroad association's challenge to final Federal Railroad Administration rule requiring rear end of all freight trains to be marked with lighting device, and which varied from proposed rule, was rejected); *Chocolate Mfr. Ass'n v. Block*, 755 F.2d 1098, 1107 (4th Cir.1985) (Department of Agriculture's proposed rule did not provide adequate notice of elimination of flavored milk from federally funded food program found in final rule). "[I]t is irrelevant whether the proposal contained in the NPR was favorable to a particular party's interests; the obligation to comment is not limited to those *adversely* affected by a proposal." *American Medical Ass'n*, 887 F.2d at 768 (italics in original). Were this otherwise, and Griffin's position was correct, an agency might never be:

> able to issue a final rule capable of standing up to review: every time [an agency] responded to public comments,

\* \* \* it would trigger a new comment period. Thus, either the comment period would continue in a never-ending circle, or, if the [agency] chose not to respond to the last set of public comments, any final rule could be struck down for lack of support in the record.

*Rybachek v. United States EPA*, 904 F.2d 1276, 1286 (9th Cir.1990), *later proceeding*, *Rybachek v. United States*, 23 Cl.Ct. 222 (1991).

The notion that Griffin did not receive notice of this issue is further undercut by the fact that late in 1980, sometime between the issuance of the proposed and final regulations, Griffin sought technical advice from the IRS as to whether its continuous rendering systems would qualify for the credit. It is baffling to this Court how the plaintiff can argue that the proposed regulation failed to notify Griffin that its interests were at stake when that same proposed regulation led the plaintiff to seek clarification from the IRS as to the positions of its interests in the matter. Judged by the above standard, it is clear that Griffin received notice of the IRS' intent to define, in proposed Treas.Reg. 1.48–9(g), those types of recycling equipment that qualified for the 10 percent business energy investment credit. Consequently, plaintiff had its opportunity to comment.

This being the case, the issue becomes whether the change found in the final regulation was the "logical outgrowth" of the proposed regulation. The proposed regulation, as published in the Federal Register, dealt specifically with defining what type of equipment, in terms of the mechanical processes employed and the material used and recovered, would be eligible for the credit. The fact that the type of material Griffin processed was ultimately excluded should not have come as a shock to the plaintiff given this detail; especially in light of the exact language the proposed regulation used concerning the material acceptable as the recovered product. Proposed Treas.Reg. § 1.48–9(g)(2)(ii)(A) and (B) fully described the material qualifying recycling equipment must recover and gave

several examples. The approach finally adopted by the IRS, while different from the proposed regulation, was a logical outgrowth of the original proposal. The final rule changed neither the substance nor the approach to determining qualified equipment. The requirement that qualified recycling equipment recover a raw material remained intact. The final regulation simply elaborated upon what was a raw material and what was not.

In light of the fact that Griffin had notice of the proposed change and that such a change was the logical outgrowth of the proposed regulation, the APA was not violated. The regulation may still, however, be invalid as contrary to Congress' intent when it passed the Energy Tax Act of 1978.

### 2. Is the regulation inconsistent with the statute?

■ The United States Supreme Court has stated that IRS regulations " 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes,' and 'should not be overruled except for weighty reasons.' " *Bingler v. Johnson*, 394 U.S. 741, 750, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969), quoting *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831, *reh. denied*, 334 U.S. 813, 68 S.Ct. 1014, 92 L.Ed. 1744 (1948). *See also United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24–26, 102 S.Ct. 821, 827–28, 70 L.Ed.2d 792 (1982) (Treasury regulation interpreting statutory term "brother-sister controlled group" to determine surtax exemption held invalid as unreasonable interpretation of statute); *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476, 99 S.Ct. 1304, 1306–07, 59 L.Ed.2d 519 (1979) (Treasury regulation defining "business league" exemption provided for by Internal Revenue Code upheld when plaintiff failed to show that regulation did not implement Congress' mandate in a reasonable manner). Further, tax regulations promulgated under a specific statutory grant of authority, such as Treas.Reg. § 1.48–9(g), are legislative regulations, as opposed to interpretative rules, and are entitled to greater deference than interpretive regulations. *Coca–Cola Bottling Co. v. United States*, 203 Ct.Cl. 18, 26, 487 F.2d 528, 532 (1973); *Goodson–Todman Enter. v. Commissioner*, 84 T.C. 255, 274–275, 1985 WL 15313 (1985), *modified*, 784 F.2d 66 (2d Cir.1986). However, a legislative regulation that is inconsistent with the language and legislative history of the statutory provision it is designed to implement cannot be sustained. *Estate of Lovett v. United States*, 224 Ct. Cl. 32, 41, 621 F.2d 1130, 1135 (1980); *Goodson–Todman Enter.*, 84 T.C. at 276. The Commissioner's authority to promulgate a regulation is not a grant of legislative power, and a regulation must comport with the applicable statutory provision and may not deprive a taxpayer of any benefits the statute bestows upon him. *Cosby v. United States*, 8 Cl.Ct. 428, 440 (1985), *aff'd*, 795 F.2d 999 (Fed.Cir.1986); *Government of Guam v. Koster*, 362 F.2d 248, 252 (9th Cir.1966). *See also Commissioner v. Engle*, 464 U.S. 206, 226, 104 S.Ct. 597, 609, 78 L.Ed.2d 420 (1984) (Treasury regulation withdrawing percentage depletion allowance on lease bonus and advance royalty income arising from oil and gas properties not entitled to deference because regulation improperly withdrew subsidy that Congress expressly contemplated industry should receive).

Plaintiff argues that the parenthetical in Treas.Reg. § 1.48–9(g)(1) (1981) which excludes animal waste from the definition of solid waste for purposes of recovery equipment is inconsistent with the intent of Congress when it passed the Energy Tax Act of 1978. In support of this position, plaintiff maintains that Congress intended the term "solid waste" in I.R.C. § 48 to have the same meaning as the term "solid waste" in section 203(4) of the Solid Waste Disposal Act. Plaintiff then relies on the legislative history of the Solid Waste Disposal Act for the proposition that Congress intended to include slaughterhouse waste in the definition of "solid waste." Plaintiff concludes that equipment that recycles slaughterhouse waste qualifies for the tax credit under the Energy Tax Act of 1978 and that Treas.Reg. § 1.48–9(g)(1) is inconsistent with the statute insofar as it ex-

cludes slaughterhouse waste from the category of source material that would be eligible for the tax credit.

Once again, the United States Tax Court's opinion in *Pepcol Mfg. Co. v. Commissioner*, 98 T.C. 127, 1992 WL 17457 (1992) (discussed *supra*), offers guidance. In *Pepcol*, the Tax Court ruled that the exclusion of animal waste from solid waste in the definition of recovery equipment in Treas.Reg. § 1.48–9(g)(1) was invalid. *Pepcol*, 98 T.C. at 137. The Tax Court's ruling is premised upon four essential observations, which are summarized in the following paragraphs.

First, the dual meaning of the term "solid waste" in the regulations conflicts with the use of the term in the Code. *Pepcol*, 98 T.C. at 134. Specifically, Treas.Reg. § 1.48–9(g)(1) differentiates between the two uses of the term "solid waste" by excluding animal waste from the definition for purposes of recovery recycling and including animal waste in the definition for purposes of conversion recycling. Like the regulation, I.R.C. § 48(*l*)(6) also makes two references to the term "solid waste"—once in the context of the recycling of solid waste and again in the context of conversion of solid waste into a fuel or other useful energy. Unlike the regulation, however, the Code does not differentiate between the two uses of the term. As the Tax Court noted, there is no explanation for the unprecedented dual use of the term "solid waste" in Treas.Reg. § 1.48–9(g)(1). *Pepcol*, 98 T.C. at 134.

Second, the Treasury regulations that apply to I.R.C. § 48 are themselves inconsistent in that the portion of Treas.Reg. § 1.48–9(g)(1) that excludes animal waste from the definition of solid waste conflicts with the definition of "solid waste" found in Treas.Reg. § 1.48–9(g)(5). *Pepcol*, 98 T.C. at 134–35. The latter regulation provides that the term "solid waste" has the same meaning as provided in Treas.Reg. § 1.103–8(f)(2)(ii)(b), which in turn refers the reader to the definition in section 203(4) of the Solid Waste Disposal Act, 42 U.S.C. § 3252(4). This section of the Solid Waste Disposal Act appears to contemplate a broad application of the term "solid waste" by providing:

> (4) The term "solid waste" means "garbage, refuse, and other discarded solid materials, including solid-waste materials resulting from industrial, commercial, and agricultural operations * * *."

Moreover, the inconsistency between the two definitions of solid waste is reinforced by the legislative history of the Solid Waste Disposal Act, Pub.L. No. 89–272, tit. II, 79 Stat. 992, which makes clear that Congress intended the term "solid waste" to include "waste from slaughterhouses." *Pepcol*, 98 T.C. at 135. The applicable portion of the House Report reads as follows:

> Solid waste collection and disposal activities create one of the most serious and most neglected aspects of environmental contamination affecting public health and welfare. Solid wastes include a great variety of things that individuals, manufacturers, commercial establishments, and communities discard as no longer usable, such as garbage, rubbish, ashes, street refuse, * * * and the *wastes from slaughterhouses*, canneries, manufacturing plants, and hospitals.

H.R.Rep. 899, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.C.C.A.N. 3608, 3614 (emphasis added).

Third, the Internal Revenue Code and the legislative history of I.R.C. § 48 provide special treatment for a variety of specific items. Nothing in the Code or the legislative history, however, provides special treatment for animal waste. If Congress wanted to treat the recycling of animal wastes differently than the recycling of other types of solid waste for purposes of the investment tax credit, then it would have expressly done so in the Code itself, or at a minimum indicated such an intent in the legislative history. *Pepcol*, 98 T.C. at 135.

Finally, the preamble of Treasury Decision 7765, 1981–1 C.B. 22, 26 makes clear that the definition of "solid waste" in I.R.C. § 48 is to be the same as the definition of "solid waste" in I.R.C. § 103 with only three exceptions, none of which apply here. *Pepcol*, 98 T.C. at 136. Further-

more, an examination of the Treasury regulation implementing I.R.C. § 103 reveals no separate treatment of animal waste in the definition of solid waste. Thus, there is nothing to indicate that Congress had an "unarticulated agenda to treat 'animal waste' as a separate category of solid waste not eligible for recycling." *Pepcol*, 98 T.C. at 137.

For all of the foregoing reasons, the Tax Court concluded that the portion of Treas. Reg. § 1.48–(9)(g)(1) which excludes animal waste from the definition of "solid waste" with regard to recovery equipment is inconsistent with the statute and with its origin and purpose. *Pepcol*, 98 T.C. at 137. Therefore, the Tax Court invalidated the exclusion. *Pepcol*, 98 T.C. at 137.

Because the *Pepcol* decision was issued on February 5, 1992, while the present action was pending, this Court directed both parties to file supplemental briefs discussing the effect of *Pepcol*. In its Supplemental Trial Brief, the Government focuses primarily on the distinction between conversion equipment and recovery equipment that was the basis for Judge Halpern's dissent in *Pepcol*. The Government's position is based upon the assumption that "recovery recycling" requires that the solid waste be recycled into an end product that is the same as or similar to the end product that gave rise to the solid waste. The Government argues that the differing uses of the term "solid waste" to exclude animal parts for purposes of recovery recycling while including animal parts within the meaning of "solid waste" for purposes of conversion recycling serve merely to reinforce the idea that animal parts, because they cannot be recycled to produce a same or similar end product, are not, therefore, susceptible to recovery recycling. Because the plaintiff's rendering process produces an end product that is different from the animals that originally gave rise to the waste, the Government views the plaintiff's rendering process as one of converting waste rather than recovering. In order to qualify for an investment tax credit for converting solid waste, however, a taxpayer must convert the solid waste "into a fuel or into useful energy such as steam, electricity, or hot water." I.R.C. § 48(*l*)(6)(D) (1978). Thus, the Government concludes that because plaintiff is converting its animal waste into something *other* than fuel or other useful energy (animal meal and tallow), the plaintiff does not qualify for an investment credit with or without the parenthetical phrases concerning animal waste in Treas.Reg. § 1.48–9(g)(1) (1981).

The Government's argument would be an appealing one if this Court were prepared to buy into the idea of a same or similar end-product requirement for recovery recycling. However, for the reasons given earlier in this opinion, this Court believes that such a restriction is without basis in the statute, regulations, or legislative history. The same or similar end-product requirement is central to the Government's argument, and without it, the Government's argument falls apart.

■ This Court is persuaded by the thorough and well-reasoned analysis of the Tax Court's *en banc* decision in *Pepcol Mfg. Co. v. United States*, 98 T.C. 127, 1992 WL 17457 (1992). As the Tax Court recognized, there is ample support in the statute and the legislative history for the idea that Congress intended to treat animal waste as a subcategory of solid waste eligible for recycling. The parenthetical in Treas.Reg. § 1.48–9(g)(1) excluding animal waste is directly contrary to congressional intent. Such being the case, the parenthetical cannot stand. Therefore, the Court concludes that the portion of Treas.Reg. § 1.48–9(g)(1) which excludes animal waste from the definition of "solid waste" with regard to recovery equipment is invalid.

### C. The Amount of the Investment Tax Credit

Having concluded that the portion of final Treas.Reg. § 1.48–9(g)(1) (1981) which excludes animal waste from the definition of solid waste is inconsistent with the Energy Tax Act of 1978 and that the plaintiff qualifies for an investment tax credit, the Court must determine the amount of that credit.

■ The amount of the investment tax credit to which Griffin is entitled depends upon whether the continuous processors replaced or supplemented the previous recycling capacity. Treas.Reg. § 1.48–9(g)(7) (1981) explains:

(7) *Increased recycling capacity.* If the equipment both replaces recycling capacity and increases that capacity at a particualr [sic] site, only the incremental cost * * * of increasing the capacity qualifies. Recycling capacity is determined by the ability to produce a product not previously produced by the taxpayer, or more of an existing product, in a way that does not lower overall production.

Logically, then, if the new recycling equipment does *not* replace recycling capacity, but instead *supplements* existing capacity, the entire cost of the new recycling equipment is available to compute the 10 percent investment tax credit.

The Court is persuaded by the testimony presented in this case that plaintiff continued to operate its batch cookers for a number of years to process "problem products" and small jobs, to test small accounts, to segregate inferior material, and as backup in the event of a breakdown. The exact frequency at which the batch cookers were used, however, is unclear.

The Government argues that Griffin should not get the full benefit of the 10 percent tax credit because Griffin only used the batch cookers occasionally and for limited purposes after the continuous processors were installed. The Court, however, is bound by the language of the regulation. It may be true that the batch cookers were not used as frequently following the installation of the continuous processors

and that, as a result, Griffin's actual *output* following the installation of the continuous processors did not increase by the entire capacity of the continuous processors, but this is not the focus of the regulation. Treas.Reg. § 1.48–9(g)(7) speaks in terms of *capacity*, not frequency of use or type of use. The fact remains that the batch cookers remained operable and were available for utilization at full capacity for a period of years following the installation of the continuous processors. Thus, whether or not it actually did so, plaintiff had the *ability* to render an amount equal to the combined capacity of the batch cookers and the continuous processors. This being the case, the Court is constrained to hold that the plaintiff is entitled to a 10 percent investment tax credit based upon the full amount of the purchase price of the continuous processors.

## CONCLUSION

For all the reasons stated above, the plaintiff prevails in this action and is entitled to a refund of the taxes paid, plus appropriate interest. In the event the parties are unable to stipulate to the exact amount of the refund due the plaintiff within 30 days, further proceedings will be scheduled.

Each party will bear its own costs.